**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 09-3031
_____

UNITED STATES OF AMERICA

v.

JERRY WHITFIELD,
                         Appellant
_____

APPEAL FROM THE UNITED STATES DISTRICT
COURT
FOR THE DISTRICT OF NEW JERSEY
(D.C. Crim. No. 08-cr-00685-001)
District Judge:  Honorable Noel L. Hillman
_____

Submitted Under Third Circuit LAR 34.1(a)
November 16, 2010
_____

Before: BARRY, CHAGARES and VANASKIE, <u>Circuit
Judges</u>

(Opinion Filed:  December 6, 2010)
_____

Norman Gross, Esq.
Office of United States Attorney
Camden Federal Building & Courthouse
401 Market Street
P.O. Box 2098, 4th Floor
Camden, NJ 08101-0000
        -and-
George S. Leone, Esq.
Office of United States Attorney
970 Broad Street

Room 700
Newark, NJ 07102-0000

Counsel for Appellee


Maggie F. Moy, Esq.
Office of Federal Public Defender
800-840 Cooper Street
Suite 350
Camden, NJ 08102-0000

Counsel for Appellant


_____

OPINION OF THE COURT
_____

BARRY, Circuit Judge


Jerry Whitfield entered a conditional guilty plea to one count of felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). Under the terms of the plea, he reserved his right to appeal the District Court's denial of his motion to suppress. That appeal is now before us. We will affirm.

## I.    BACKGROUND

Whitfield filed a motion to suppress a gun and other evidence that emanated from his arrest on April 30, 2008. The evidentiary hearing on that motion spanned two days, and included testimony from three police officers, Whitfield's girlfriend, Raheem Langston (a friend of Whitfield's who was with him on April 30, 2008 and whom police also detained), and Whitfield's investigator. The District Court found the police officers' testimony to be credible and did not credit Langston's testimony.[1] Importantly, the Court made factual

_____

[1] The testimony of Whitfield's girlfriend and investigator are not central to the issue he raises on appeal.

2

findings that Whitfield does not challenge before us.

Given that we write only for the parties, a brief summary of the facts will suffice. Around 9:30 p.m. on April 30, 2008, four Camden, New Jersey, police officers in three marked police cars were patrolling a residential street in an area of Camden known for violence and drug activity, particularly crack sales. The cars were traveling in a "caravan," so that all three cars were in a line moving down the street, with Officers Figueroa and Torres in the first car, Officer Redd in the second, and Sergeant Rivera in the third. The officers were on "supplemental patrol," which Redd described as "proactive work . . . in target areas, like hot spots in the city, as far as drug corners [and] gun calls," and were not responding to any particular complaint nor did they have any information about Whitfield at that time. (R. at 46.)

The caravan was approaching a corner that the officers knew was a "drug set," or an area known for drug sales. (*Id.* at 48.) Figueroa and Torres radioed that two people were standing on the right having a conversation. They did this to "give a view of what [the other officers were] coming up on so that they, [were] alert to what is going on in the block." (*Id.* at 124.) From the second car, Redd saw two men, later identified as Whitfield and Langston, surreptitiously exchange something and quickly walk away. Redd did not tell the other officers that he saw this hand-to-hand exchange, but radioed, "check these two guys out on the corner." (*Id.* at 73.) The officers all stopped their cars, and Redd got out and went to the sidewalk. Rivera heard someone say over the radio that one of the men was coming toward him, and he got out of his car, too.

At some point, either right after the hand-to-hand exchange or as Whitfield walked toward Redd and Rivera, the officers saw him "put his hand in his pocket real quick" and believed that he was holding something. (*Id.* at 51.) Both officers repeatedly ordered him to take his hand out of his pocket, and drew their weapons. He did not comply with their orders, and continued to walk toward Redd. Redd thought Whitfield was "looking around like looking to escape." (*Id.* at

3

52.)

Rivera was between Whitfield and Redd, and when Whitfield got close to Rivera, Rivera holstered his gun, "grabbed" Whitfield, and "dragged" him toward a police car. (*Id.* at 116-17.) When Whitfield said that he had a gun, Redd "rushed up" and pulled Whitfield's hand out of his pocket. (*Id.* at 53.) The gun was recovered, and Whitfield was arrested.

## II.   JURISDICTION AND STANDARD OF REVIEW

We have jurisdiction pursuant to 28 U.S.C. § 1291. Our review of the District Court's determination that there was reasonable suspicion to seize Whitfield and, thus, that the motion to suppress should be denied, is plenary. *Ornelas v. United States*, 517 U.S. 690, 699 (1996) ("as a general matter determinations of reasonable suspicion and probable cause should be reviewed *de novo* on appeal," but factual findings should be reviewed for clear error).

## III.   ANALYSIS

### A.   Legal Framework

When a police officer has "a reasonable, articulable suspicion that criminal activity is afoot," he or she may conduct a "brief, investigatory stop." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000) (discussing *Terry v. Ohio*, 392 U.S. 1 (1968)). "Reasonable suspicion" requires less than probable cause, but there must be "at least a minimal level of objective justification for making the stop." *Id.* In determining whether there was reasonable suspicion, we consider the totality of the circumstances, i.e., "the whole picture." *United States v. Cortez*, 449 U.S. 411, 417 (1981). Among the "pertinent factor[s]" that an officer may consider are whether the area is a high-crime area, a suspect's "nervous, evasive behavior," and flight from police officers. *Wardlow*, 528 U.S. at 124. It is not necessary that the suspect actually have done or is doing anything illegal; reasonable suspicion may be "based on acts capable of innocent explanation." *United States v.*

4

*Valentine*, 232 F.3d 350, 356 (3d Cir. 2000). The circumstances, however, "must raise a suspicion that the particular individual being stopped is engaged in wrongdoing." *United States v. Cortez*, 449 U.S. 411, 418 (1981). Reasonable suspicion "must be based on commonsense judgments and inferences about human behavior." *Wardlow*, 528 U.S. at 125.

In determining whether there was reasonable suspicion to seize Whitfield, we may consider everything that occurred until the moment he was seized, which it is not disputed was when he was grabbed by Rivera. One factor that may be considered is his failure to have complied with the officers' orders.[2] *Valentine*, 232 F.3d at 359. A failure to follow orders does not *alone*, however, give rise to reasonable suspicion. *Florida v. Bostick*, 501 U.S. 429, 437 (1991).

### B.    The District Court's Decision

The District Court denied Whitfield's motion to suppress in an oral opinion on February 27, 2009, and supplemented that ruling on March 19, 2009, stating that the issue was "a close call" and that "any change in the facts here could very well have changed the result." (R. at 10.) The Court concluded that Whitfield was seized when Rivera grabbed him "after the failed attempt to get him to stop," and that it had reviewed "all of the collective knowledge of the officers up to the point of the seizure." (*Id.* at 11.)

The District Court credited Redd's testimony that he believed that the closed fist hand-to-hand exchange he saw between Whitfield and Langston in the "drug set" was suspicious. The Court stated that "guns and drugs go

---

[2] Whitfield argues that we should not consider his failure to follow orders because the orders were invalid. This argument fails for two reasons: (1) Redd had reasonable suspicion before he ordered Whitfield to do anything, and (2) Fourth Amendment issues potentially arise not when the police issue an *order* but rather when a person is *seized* by submitting to an order or the police exert physical force.

together." (*Id.* at 12.) Moreover, the Court found that Langston and Whitfield moved away from each other and the corner "in what appear[ed] to be a reaction to the presence of the police" and specifically noted Redd's testimony regarding Whitfield "looking around" and his "furtive gestures, typical of an individual now confronted with police officers, looking for a way out." (*Id.* at 12-13.) Nonetheless, said the Court, Whitfield's conduct up to that point was "consistent with innocent behavior," and "[p]eople should be able to greet one another [by shaking hands or "fist bump[s]"] and part company without being stopped by the, seized by the police." (*Id.* at 13.)

But then, the District Court continued, Whitfield put his hand in his pocket "with the furtive gesture" and in an "apparent effort to protect something," and emphasized Whitfield's refusal to stop or take his hand out of his pocket. (*Id.*) The Court concluded that the officers had reasonable suspicion due to "the presence in the evening hours after 9:00 o'clock [sic] in a high crime area where there's been drug transactions, arrests for drug transactions, shootings, what appears to be a hand-to-hand exchange, followed by a movement away from one another, and from the officers, the furtive gestures looking for a way out, insertion of the hand in the pocket in an effort to conceal something or secure something, refusal to stop, [and] refusal to show hands." (*Id.* at 14.)

### C. The Officers had Reasonable Suspicion[3]

Whitfield contends that because Rivera grabbed him first we may look only to the facts that Rivera himself knew in determining whether there was reasonable suspicion to seize Whitfield. (*See, e.g.*, Appellant's Br. at 14 ("At the time Sergeant Rivera physically grabbed Whitfield, the facts

---

[3] Whitfield argues that the District Court "substitute[d] a general suspicion standard for the requisite particularized suspicion standard." (Appellant's Br. at 10.) Given the Court's discussion of the particular events on April 30, 2008, we reject that argument without further discussion.

known to him did not establish reasonable, articulable suspicion that Whitfield was involved in criminal activity.").) He argues that what is commonly known as the "collective knowledge doctrine" – under which the knowledge of one law enforcement officer is imputed to the officer who actually conducted the seizure, search, or arrest – should not apply to the seizure at issue here.[4]

We have not yet applied the collective knowledge doctrine to a *Terry* seizure in a precedential opinion, but we have applied it in other Fourth Amendment contexts. In *United States v. Belle*, 593 F.2d 487, 497 n.15 (3d Cir. 1979), for example, we flatly stated that "[t]he collective knowledge of the investigating officers is measured in determining probable cause" for an arrest. In *United States v. Menon*, 24 F.3d 550, 562 (3d Cir. 1994), we held that agents properly seized documents under the plain view doctrine and that "the immediate apparency of criminality should be measured, at a minimum, by the collective knowledge of the officers on the scene."

Other courts of appeals have applied the collective knowledge doctrine to *Terry* seizures as well as in other Fourth Amendment contexts. *See, e.g.*, *United States v. Cook*, 277 F.3d 82, 86 (1st Cir. 2002) ("Here, common sense suggests that, where law enforcement officers are jointly involved in executing an investigative stop, the knowledge of each officer should be imputed to others jointly involved in executing the stop."); *United States v. Ledford*, 218 F.3d 684, 689 (7th Cir. 2000) (holding that in the probable cause analysis it did not matter which of several officers actually opened a car trunk and that "[b]ecause the search was a joint endeavor, the court may properly consider" what other officers knew). Whitfield fails to cite – and we have not found – any court of appeals that has held to the contrary.

---

[4] Whitfield cites only *United States v. Ramirez*, 473 F.3d 1026 (9th Cir. 2007), to support his argument and only that part of the opinion that discussed application of the doctrine in a scenario inapposite here.

It would make little sense to decline to apply the collective knowledge doctrine in a fast-paced, dynamic situation such as we have before us, in which the officers worked together as a unified and tight-knit team; indeed, it would be impractical to expect an officer in such a situation to communicate to the other officers every fact that could be pertinent in a subsequent reasonable suspicion analysis. Applying the collective knowledge doctrine here, there is little question that there was reasonable suspicion to seize Whitfield.

## IV. CONCLUSION

Because the District Court correctly concluded that there was reasonable suspicion to seize Whitfield, the judgment of the Court will be affirmed.