**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 15-1791
_____

UNITED STATES OF AMERICA

v.

MANUEL GONZALEZ
                              Appellant
_____

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA
(D.C. No. 2-14-cr-00015-001)
District Judge: Hon. Luis Felipe Restrepo
_____

Submitted Under Third Circuit LAR 34.1(a)
November 9, 2015
_____

Before: CHAGARES, SHWARTZ, and RENDELL, <u>Circuit Judges</u>.
(Filed: November 13, 2015)

_____

OPINION[*]
_____

SHWARTZ, <u>Circuit Judge</u>.

---

[*] This disposition is not an opinion of the full Court and, pursuant to I.O.P. 5.7, does not constitute binding precedent.

Manuel Gonzalez appeals an order denying his motion to suppress evidence recovered from his vehicle. For the reasons set forth below, we will affirm.

I

Philadelphia Police Officer Jonathan Czapor, a thirteen-year veteran of the police force, has led hundreds of narcotics surveillance operations, including at least 100 operations at the intersection of Marshall and Venango Streets in Philadelphia, Pennsylvania (the "Intersection"), a location known for violence and illegal drug activity. During prior surveillance operations at the Intersection, Czapor observed drug sales and learned that the street-level dealers "work in conjunction with several other individuals," App. 42, including "a lookout," App. 43, "a re-up person, . . . [who] would . . . provide the street level dealer with more product to sell," App. 43, and "a money person . . . [who] will come around and collect the proceeds from that street level dealer on a routine basis." App. 43.

On August 7, 2013, Czapor and his partner, Officer Ephrain Torres, were patrolling the area surrounding the Intersection. Several backup officers were assigned to patrol the vicinity, including Officer Eric Crawford, who was ready to "stop" and "arrest[] . . . any individuals that Officer Czapor observed engaged in narcotics activity." App. 74.

At approximately 10:00 p.m., Czapor and Torres observed Wayne and Kenneth Griffin standing by the Intersection engaged in conversation in front of a closed store,

and decided to establish surveillance.[1]  "A short while later," they saw Wayne walk a short distance on Venango Street.  App. 45.

At 10:10 p.m., Czapor observed a green Saturn park, and saw the driver, Danis Velasquez, exit the car and speak with Kenneth, who pointed Velasquez in Wayne's direction.  After Velasquez and Wayne engaged in a brief discussion, Wayne "removed a cigarette pack from his front pocket," opened the box, and handed Velasquez "small items in exchange for United States currency."  App. 46.  Wayne then pocketed the money and the cigarette box, and Velasquez returned to the Saturn and departed.  Czapor, who was using binoculars to surveil the encounter, knew Wayne had not handed Velasquez a cigarette, and "believed that [he] had just observed a narcotics transaction."  App. 47.  He then provided the backup officers with Velasquez's physical and vehicle description, and "[w]ithin a minute or so Officer Crawford . . . relayed to [Czapor] that he had . . . stopped that vehicle and arrested [the driver] after recovering one purple packet of alleged powder cocaine."  App. 48.

The surveillance continued.  Around 10:20 p.m., Czapor saw a gray Buick sedan park at the corner of the Intersection, and the driver, Louis Martinez, exit the car and engage in a similar transaction with the Griffins, with Martinez exchanging money for a small packet from Wayne, before driving away.  Czapor again "provide[d] backup officers with the description" of the vehicle, and another backup officer, Officer Logan, stopped the Buick and relayed to Czapor that he had arrested Martinez "after recovering one purple packet of cocaine."  App. 50.

---

[1] For convenience, we will refer to each Griffin by his first name.

Czapor continued to surveil the Intersection, and at approximately 10:30 p.m., he "observed a black Ford Taurus arrive at the intersection" with three occupants and "park[] directly in front of [the officers'] surveillance vehicle." Id. Czapor observed the driver of the Taurus, appellant Manuel Gonzalez, exit the driver's seat. Kenneth "greet[ed] . . . Gonzalez . . . by giving him a handshake and . . . a half a hug." App. 51. Kenneth then walked over to Wayne. Czapor saw Wayne take "stacks of money . . . folded in half . . . from various pockets," App. 67, and hand the bills to Kenneth, who then delivered the money to Gonzalez. Gonzalez returned to the Taurus and drove away.

Based on his observations of "how these corners operate," Czapor "believe[d] that [Gonzalez] had picked up the proceeds" of the drug transactions, and accordingly "provided backup officers with [Gonzalez's] description to have [him] stopped." App. 51-52. Czapor described Gonzalez as a "Hispanic male wearing a blue tee-shirt and blue jeans driving a black Ford Taurus." App. 55. Crawford testified that he received this information from Czapor[2] and, "within three minutes," App. 90, saw a black Taurus, and stopped the car.[3]

Crawford exited his vehicle, leaving the spotlights on, and "quickly approached" the Taurus, App. 78, to see if the driver matched the description Czapor provided. "[B]y

___

[2] According to Crawford, Czapor also told him that Gonzalez had received money and the direction he was traveling, but Czapor testified only that he gave a description of the vehicle and driver, and did not mention these other details.

[3] Crawford testified he was not explicitly told that the driver of the Taurus was engaged in criminal activity, but that he "would only receive the information if that individual was involved in criminal activity, specifically related to narcotics. That's what [his] assignment was that day to be out there for. That was what Officer Czapor's assignment was. So he wouldn't have given it to me if it wasn't related to narcotics." App. 94

4

the time [Crawford] reached the trunk of [the Taurus]," flashlight in hand, Crawford "could see [a] gun in [the driver's] right hand leaned over the seat." App. 82. Crawford ordered the driver, Gonzalez, to drop the gun. One of the passengers took the gun from Gonzalez, and Crawford then ordered the passenger to drop the gun. The passenger eventually complied. Thereafter, the officers recovered a loaded black Ruger 9 millimeter handgun from the car and $1,019 from Gonzalez's pocket. Gonzalez was charged with being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1).

Gonzalez moved to suppress the gun recovered from his car on the ground that Crawford lacked reasonable suspicion to stop his car. The District Court held a suppression hearing, and denied the motion, finding "that Officer Czapor had 'a reasonable, articulable suspicion that criminal activity [was] afoot,' justifying the investigatory stop of Mr. Gonzalez's car." App. 4 (quoting Illinois v. Wardlow, 528 U.S. 119, 123 (2000) (citing Terry v. Ohio, 392 U.S. 1 (1968))).

The case proceeded to trial, and the jury found Gonzalez guilty of possession of a firearm by a convicted felon. Gonzalez appeals the denial of his motion to suppress the firearm.

II[4]

---

[4] The District Court had jurisdiction pursuant to 18 U.S.C. § 3231. We have jurisdiction pursuant to 28 U.S.C. § 1291. We review the denial of a motion to suppress "under a mixed standard of review, exercising plenary review over legal determinations and reviewing findings of fact for clear error." United States v. Navedo, 694 F.3d 463, 467 n.4 (3d Cir. 2012) (quoting United States v. Lewis, 672 F.3d 232, 236-37 (3d Cir.

This appeal requires us to address (1) whether Czapor had reasonable suspicion that Gonzalez was engaged in criminal activity to justify a Terry stop; and (2) if so, whether that knowledge may be imputed to Crawford under the "collective knowledge" doctrine.

Terry allows law enforcement officers to conduct a brief stop of an individual if there is reasonable suspicion to believe the individual may be engaged in criminal activity. See 392 U.S. at 30. The Terry doctrine applies equally to vehicle stops. See United States v. Hensley, 469 U.S. 221, 226 (1985); United States v. Mathurin, 561 F.3d 170, 174 (3d Cir. 2009). A determination of whether reasonable suspicion exists depends on the "totality of the circumstances," and must be based on a "reasonable, articulable suspicion" that exists before the stop occurs. Wardlow, 528 U.S. at 123, 127. A reasonable suspicion determination requires "more than an inchoate and unparticularized suspicion or hunch of criminal activity." Id. at 123-24 (citation and quotation marks omitted). While the test for reasonable suspicion is an objective one, we "allow[] officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." United States v. Arvizu, 534 U.S. 266, 273 (2002) (citation and quotation marks omitted).

Czapor's observations that night, his knowledge of past activity at the Intersection, and his investigative inferences provided him with reasonable suspicion to believe

___

2012)). We review reasonable suspicion determinations de novo. United States v. Arvizu, 534 U.S. 266, 275 (2002).

6

Gonzalez was involved in illegal activity. First, Gonzalez was present at a late hour in a high-crime area known for drug activity. See United States v. Goodrich, 450 F.3d 552, 561 (3d Cir. 2006) (presence in a high crime area and time of day are relevant considerations in a Terry analysis). Second, Czapor observed Gonzalez warmly greet Kenneth, and then take a stack of money from Wayne who, just minutes earlier, had collected money in two drug transactions. These events, viewed in connection with Czapor's extensive experience and knowledge, supported the District Court's finding that reasonable suspicion existed to believe Gonzalez was involved in this drug activity.

Gonzalez argues that the officers lacked reasonable suspicion because none of the activities Czapor observed were illegal. We have noted, however, that reasonable suspicion may be found even by observing "exclusively legal activity." United States v. Ubiles, 224 F.3d 213, 217 (3d Cir. 2000). Indeed, a proper evaluation of the totality of the circumstances cannot be reduced to distinct factors taken in isolation, and a number of activities, even if entirely legal and innocent themselves, may "warrant[] further investigation." Arvizu, 534 U.S. at 274 (quoting United States v. Sokolow, 490 U.S. 1, 9 (1989)). Although there may be nothing inherently illegal about greeting someone on the street and exchanging money, when viewed from the perspective of a veteran narcotics officer who sees such activity late at night on a street known for drug activity taking place within minutes of multiple drug transactions, the officers had sufficient facts to support a reasonable, individualized suspicion that the person receiving the money was engaged in criminal activity.

7

While such facts provided Czapor with reasonable suspicion that Gonzalez was engaged in criminal activity, the stop of Gonzalez's car is only valid if Crawford also had proper grounds for pulling Gonzalez over. Thus, we must decide whether Czapor's reasonable suspicion may be imputed to Crawford under the "collective knowledge" doctrine.

The collective knowledge doctrine allows imputation of one law enforcement officer's knowledge to another officer who actually makes a stop, even if the latter does not possess all relevant facts. See United States v. Whitfield, 634 F.3d 741, 745 (3d Cir. 2010); see also United States v. Robertson, 305 F.3d 164, 168 (3d Cir. 2002) ("[R]easonable suspicion can be based on information gathered from another person."). The doctrine allows the "police . . . to act on the strength" of work done by fellow officers. See Whiteley v. Warden, 401 U.S. 560, 568 (1971). Under the rule, determinations concerning the existence of reasonable suspicion can be made based on the knowledge of the officer conveying the information, not on "whether those relying on the [information] were themselves aware of the specific facts which led their colleagues to seek their assistance." Hensley, 469 U.S. at 231. Thus, "[t]he legality of a seizure based solely on statements issued by fellow officers depends on whether the officers who issued the statements possessed the requisite basis to seize the suspect." Rogers v. Powell, 120 F.3d 446, 453 (3d Cir. 1997) (citing Hensley, 469 U.S. at 231-32) (emphasis omitted). As we have already determined, Czapor, the issuing officer, possessed the requisite reasonable suspicion.

8

Additionally, in communicating a description of both Gonzalez and the car he was driving, Czapor provided sufficient information to impute his knowledge and reasonable suspicion to Crawford. While we have held that exceedingly vague descriptions can preclude a finding of reasonable suspicion, Czapor's description of the color, make, and model of the car and description of Gonzalez's race, gender, and clothing provided Crawford with enough information to locate and stop Gonzalez's car.[5] Cf. United States v. Brown, 448 F.3d 239, 247-48 (3d Cir. 2006) (generic description of two African-American males was insufficient to provide a basis for officer's stop); United States v. Kithcart, 134 F.3d 529, 530-32 (3d Cir. 1998) (description was insufficient to justify a stop of a car with one apparent occupant where officer told to look for "two black males in a black sports car"). **App. 53, 55**. Czapor's communication allowed Crawford not only to seek a specific car in the nearby area, but also to quickly identify the person Czapor observed.[6] **App. 75, 90**. That Czapor failed to provide Crawford with a greater description of the facts supporting his suspicion does not change this conclusion. Crawford had sufficient information about the car he was to stop and its occupant, and understood the nature of both the surveillance operation and his role to arrest "any individuals that Officer Czapor observed engaged in narcotics activity." App. 74. As a

---

[5] Czapor's account of the communications alone, even without the details Crawford recounted concerning the direction of Gonzalez's travel or his receipt of money, provided Crawford with reasonable suspicion to stop Gonzalez.

[6] Crawford testified that although he had been given a physical description of Gonzalez, he did not see the driver until after stopping the Taurus. This distinction, however, does not change our analysis because Crawford acted properly in stopping a vehicle matching the specific make, model, and color he was provided, and acted immediately to confirm he had stopped the correct suspect.

9

result, it was not necessary to require Czapor to "communicate to [Crawford] every fact that could be pertinent in a subsequent reasonable suspicion analysis." Whitfield, 634 F.3d at 746. Therefore, Czapor's information and his communication to Crawford allows us to impute his reasonable suspicion to Crawford, and as a result, Crawford's stop of Gonzalez was lawful.[7]

III

For the foregoing reasons, we will affirm the District Court's order.

---

[7] Gonzalez additionally argues that the collective knowledge doctrine should not apply because this was not a "fast-paced, dynamic situation" such as the one in Whitfield. This argument is unavailing. This situation was fast-paced and dynamic given the series of events observed over a thirty-minute period during the surveillance operation. In any event, nothing in Whitfield or the Supreme Court's jurisprudence limits the collective knowledge doctrine to such situations. See Hensley, 469 U.S. at 223-24 (upholding application where six days passed between the bulletin being sent and Hensley's arrest).