PRECEDENTIAL
UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 16-3650
_____

UNITED STATES OF AMERICA

v.

CORY D. FOSTER,
                                   Appellant

_____

No. 16-4225
_____

UNITED STATES OF AMERICA

v.

LAWRENCE PAYTON,
                                   Appellant
_____

On Appeal from the United States District Court
for the District of Delaware
(D.C. Nos. 1-15-cr-00021-01 and 02)
District Judge:  Hon. Richard G. Andrews

_____

ARGUED
March 13, 2018

Before: JORDAN, SHWARTZ, and KRAUSE, *Circuit Judges*

(Filed: May 30, 2018)
_____

Douglas L. Dolfman
1617 John F. Kennedy Blvd. – Ste. 1660
Philadelphia, PA   19103

Lisa B. Freeland
Renee D. Pietropaolo   [ARGUED]
Office of Federal Public Defender
1001 Liberty Avenue
1500 Liberty Center
Pittsburgh, PA   15222
        *Counsel for Appellant Cory D. Foster*

Edson A. Bostic
Tieffa N. Harper
Eleni Kousoulis   [ARGUED]
Office of Federal Public Defender
800 King Street – Ste. 200
Wilmington, DE   19801
        *Counsel for Appellant Lawrence Payton*

David C. Weiss
Robert F. Kravetz
Edmond Falgowski

Elizabeth L. Van Pelt   [ARGUED]
Office of the United States Attorney
1007 N. Orange Street – Ste. 700
P.O. Box 2046
Wilmington, DE   19899
    *Counsel for Appellee*

_____

OPINION OF THE COURT
_____

JORDAN, *Circuit Judge*.

In this consolidated appeal, Cory Foster and Lawrence Payton raise a number of issues arising out of their prosecution for being felons in possession of firearms.  For the following reasons, we will affirm the convictions and sentences.

## I.      Background

### A.      Facts Relevant to Both Foster and Payton[1]

The events leading to prosecution began on February 5, 2015, when Joseph Turchen, an employee of a barbershop in the Branmar Plaza shopping center in Wilmington, Delaware, observed what he perceived as troubling behavior by occupants of a silver Honda Accord in

_____

[1] Unless otherwise noted, the facts contained in this subsection derive from trial evidence and testimony that was consistent with the evidence and testimony offered by the government at a pre-trial suppression hearing.

the shopping center parking lot. Turchen watched the Accord's two occupants for approximately twenty minutes. He testified that the man in the passenger seat had a full beard and wore a hoodie, skull cap, and dark glasses and that the man in the driver's seat was wearing a hoodie and a red or pink scarf over his face the whole twenty minutes he was sitting in the car. Turchen found the occupants' behavior suspicious because they were repeatedly looking around the strip of stores in Branmar Plaza, including the barbershop, a bank, and a jewelry store, and because he thought one of the occupant's movements indicated "he was pumping himself up to do something." (App. at 547.) Turchen also testified that the car's occupants were "dressed like they was going to go do something." (App. at 543.) He could not identify the car's occupants; he could only tell that they were two black males, one with lighter skin. His suspicions resulted in another barbershop employee calling 911 to report the suspicious behavior.

When Delaware State Troopers arrived, Turchen saw the Accord's occupants look towards the police cars, which were at the opposite side of the parking lot. The Accord then promptly left the lot. Before the car pulled away, the barbershop's owner, Joseph Strano, got into his truck, followed the Accord, and took a picture of it and its license plate. He provided that picture to Trooper Natalie George, one of the troopers who had responded to the 911 call.

Trooper George ran the Accord's license plate number through a police database and discovered that the car had been reported stolen in an armed robbery. She then sent an e-mail to other troopers alerting them of that fact and attaching

4

the picture of the Accord, which revealed a distinct bumper sticker on the rear of the car.[2]

Trooper William Yeldell was one of the police officers who received George's e-mail. He patrolled the area around Branmar Plaza on a daily basis and the e-mail prompted him to pay particular attention to Branmar Plaza the following morning, February 6, to see if the Accord would return. It did, and he got a clear look at its occupants, but only when he passed right in front of it, dressed in full uniform in an unmarked police car. At that point, he made direct eye contact with those individuals. He saw that the one in the passenger seat was wearing glasses, a red or pink scarf, and a white button-up shirt, and that the one in the driver's seat was a black male with facial hair and a black jacket over a purple shirt. At trial, Yeldell identified the man in the passenger seat as Foster and the man in the driver's seat as Payton.

After passing in front of the Accord, Yeldell communicated with other state troopers over the radio that he would need assistance making a vehicle stop. He left the parking lot to meet with the troopers responding to his radio call and to put himself in a better position to make a safe stop. In doing so, he lost sight of the Accord for less than a minute.

---

[2] George's e-mail, and the fact that she ran the Accord's license plate through a police database to discover its stolen status, were only introduced during a pre-trial suppression hearing. Trial testimony established that other state troopers received an e-mail from George that contained a picture of the Accord and, in summary, relayed that it was a stolen car.

When the troopers returned to the parking lot, Yeldell noticed one of the men he had seen was now standing outside of the Accord. The second man was no longer in or near the car.

### B. Foster-Specific Facts[3]

Yeldell knew, with what he described as 100% certainty, that the man outside of the car was the same one he had observed in the Accord's passenger seat. He testified that he recognized the white button-up shirt and the "light red or pink colored scarf." (App. at 621.) That individual turned out to be Foster.

After noticing that Foster was holding an object in his hand, Yeldell pulled out his gun and ordered him to the ground. Foster ran instead. He passed another trooper, who shot him with a Taser. As he fell to the ground, "a hand gun went flying through the air." (App. at 623.) The troopers attempted to subdue Foster, and, after a struggle, he was tased a second time. The officers then placed him in handcuffs and recovered a loaded .380 caliber black Smith & Wesson semi-automatic pistol.

---

[3] Facts contained in this subsection derive from trial evidence and testimony.

**Payton-Specific Facts**[4]

While Yeldell and other officers were detaining Foster, Trooper Daniel McColgan responded to a radio call regarding the Accord's missing second occupant. He began a search of the mixed commercial and residential area around Branmar Plaza to locate the suspect, reported only as a black male. McColgan had also received and read George's e-mail from the previous day, which noted that two potentially "armed and dangerous" black men were observed in a stolen Honda Accord at Branmar Plaza. (App. at 301.)

At around 10 o'clock in the morning, and within approximately six minutes of receiving the alert about the missing suspect, McColgan saw a black man, later identified as Payton, walking along a road from the direction of Branmar Plaza and about two-tenths of a mile from the shopping center. He observed Payton holding a soda and wearing a white skull cap, a dark jacket, and jeans. Payton was walking "calmly down the street[.]" (App. at 235.) McColgan, who was in an unmarked SUV but dressed in full uniform, drove by him and they "basically both nodded at each other." (App. at 208.) The trooper did not stop because he wanted to "see what kind of reaction" he would get from Payton by driving by and did not want to approach a potentially armed suspect alone. (App. at 209.) He continued to monitor Payton for a little over four minutes. As he did so, he radioed to ask if "anybody [had] a better description … to work with" because, at that time, he knew

---

[4]    Facts contained in this subsection derive from evidence and testimony proffered by the government during a pre-trial suppression hearing.

simply that he was looking for a black male who had fled on foot. (App. at 210-11.) Payton was the only pedestrian he had seen in the search area matching the generic description relayed over the radio.

McColgan testified that Payton was "just lackadaisical walking down the street" and that it didn't "seem like he[] [was] going any place in particular." (App. at 214.) He did not observe Payton approach any stores or any other people. Payton continued to walk beside the road at the same calm pace. As McColgan watched Payton and maintained radio contact with other officers who had arrived to assist him, he told his fellow officers to continue searching the area "in case this person was not the person we believe was involved in this." (App. at 221.) None of the officers, however, reported seeing any pedestrians matching the general description of the suspect.

Eventually, McColgan and his colleagues decided to stop Payton. When they were in position to do so, McColgan used his loudspeaker to tell Payton to put his hands on his head. Payton promptly complied. The officers handcuffed Payton, patted him down, and placed him in the back of McColgan's SUV. Payton did not have any weapons with him. McColgan questioned him and learned that Payton did not have identification, that he reported coming from the "market up the street," and that he was from Philadelphia. (App. at 227-28.) What little identifying information Payton chose to provide turned out to be false.

McColgan had fourteen years of experience patrolling the area around Branmar Plaza. He acknowledged that he was not familiar with all of the people who lived in that area

8

and that it was possible that Payton could have been a resident of one of the developments nearby. McColgan explained, however, that it was rare for pedestrians to be walking on the side of the road where he saw Payton. It was a 40 mile-per-hour road with no sidewalks at the location where Payton was stopped. McColgan said that, in his experience, only two pedestrians walked with any frequency along that stretch – both white special needs adults. He further testified that Payton was "new to the area" and seemed to have "no rhyme or reason [for] where he was going[.]" (App. at 225.) At the time McColgan stopped Payton, he did not have a specific physical description of the missing suspect or of the clothes the suspect was wearing.

After placing Payton in the back of his SUV, McColgan drove him back to Branmar Plaza for identification.

### C. Search of the Accord[5]

Following Foster's and Payton's apprehension, the stolen Accord was transported to the state police's "Evidence Detection Unit." (App. at 630.) A search of the car revealed a loaded Hi-Point .9mm rifle, with a scope, inside a carrying case on the back seat, along with multiple rolls of duct tape, a pair of gloves, and a large drawstring bag. Trial testimony later established that the Accord was stolen in December 2014 and that it did not contain the rifle, rolls of duct tape, or

---

[5] The facts in this subsection are derived from trial testimony and trial evidence.

gloves when it was stolen. No DNA or fingerprint evidence connected Foster or Payton to the items found in the car.

### D. Relevant Pre-Trial Evidentiary Rulings

The defendants filed several motions in limine, challenging the admissibility of certain evidence and testimony.[6] Two pre-trial rulings in particular are relevant on appeal.

First, Payton sought to exclude evidence stemming from what he argues was his unconstitutional stop and detention. He asserted that McColgan did not have reasonable suspicion to stop him when he was walking calmly down the road. The government responded that the totality of the circumstances provided reasonable suspicion for the stop. The District Court concluded that McColgan had reasonable, articulable suspicion to stop Payton, and thus did not exclude any evidence on that ground. The Court explained that the totality of the circumstances provided reasonable suspicion, despite the vague description of the missing suspect. More specifically, the Court highlighted that McColgan knew that a potentially dangerous suspect had very recently fled on foot, that he saw Payton within a defined search area in which no other individuals matched the broad description of the suspect, that Payton was stopped in close geographic proximity to the last location the suspect was observed, and that McColgan knew from experience that it was unusual to

---

[6] Although the parties filed numerous motions in limine, we discuss here only those motions and resulting rulings that are the subject of this appeal.

10

see an unknown pedestrian walking in the area where he spotted Payton.

Second, Foster and Payton both sought to exclude the barbershop employees' testimony concerning the events of February 5, arguing that it was impermissible propensity evidence, not relevant to the jury's consideration of the crime charged, and unduly prejudicial. The government responded that the testimony constituted evidence of motive, properly admissible pursuant to Federal Rule of Evidence 404(b). The government argued that the testimony allowed it to "provide a motive for Defendants' gun possession" by demonstrating that they were preparing to commit an armed robbery. (App. at 34.) The District Court agreed with the government and allowed the testimony to show motive. The Court further reasoned that any prejudice to the defendants did not outweigh the testimony's probative value, which was relevant to material facts (i.e., gun possession) that the government had to prove to obtain convictions on the crimes charged. The government was thus able to use the barbershop employees' testimony at trial to support its theory of the case, arguing to the jury that the "case [was] about two days in a row, two men, two guns, and a plot to commit a robbery." (App. at 505.)

### E. Convictions and Sentencing Enhancements

Foster and Payton proceeded to a jury trial and were each convicted of unlawful possession of a firearm by a felon, in violation of 18 U.S.C. § 922(g)(1). Payton challenges the sufficiency of the evidence underlying his conviction. Both men challenge their resulting sentences.

11

Payton argues that the District Court erred by applying a four-level enhancement pursuant to United States Sentencing Guideline ("U.S.S.G.") § 2K2.1(b)(6)(B). That section provides for a sentencing enhancement when a defendant uses a firearm in relation to another felony offense. The enhancement was triggered by the District Court's determination that Payton was involved in a conspiracy with Foster to commit robbery on the day he was arrested. Payton timely objected, arguing that the evidence at trial was insufficient for the government to prove, by a preponderance of the evidence, that he was involved in any such conspiracy. The Court rejected Payton's argument and determined that the government had satisfactorily shown use of the firearm at issue "in connection with another felony offense, namely; conspiracy to commit a robbery[.]" (App. at 1088.) The Court explained, "I heard the evidence at trial. I think there is no reasonable conclusion from the evidence other than the two defendants were casing the business in the Branmar Shopping Center with the intent to rob it." (App. at 1088.) Payton was sentenced to 37 months of incarceration.

Foster contends that the District Court erred by applying the enhancement contained in U.S.S.G. § 2K2.1(c)(1) to increase his advisory guidelines range from 63-78 months to 210-262 months. Section 2K2.1(c)(1) provides for a sentencing enhancement if a defendant used the same gun associated with the offense of conviction in connection with another offense. U.S.S.G. § 2K2.1(c)(1). The District Court applied that enhancement because Foster's Presentence Report ("PSR") concluded that he had used the same pistol recovered during his Delaware arrest to commit a

string of robberies and a carjacking in Pennsylvania.[7]  Foster did not object to that enhancement during his sentencing proceedings, and he was sentenced to 120 months of incarceration, the statutory maximum.

## II.    Discussion[8]

Five issues are presented on appeal.  First, Payton contends that the District Court erred by concluding that McColgan had reasonable suspicion to stop and question him.  Second, both Foster and Payton challenge the Court's evidentiary ruling allowing the government to introduce the barbershop employees' testimony concerning the events of February 5.  Third, Payton argues that there was insufficient evidence to support his conviction for constructive possession of a firearm.  Fourth, Payton asserts that the District Court erred by applying U.S.S.G. § 2K2.1(b)(6)(B) to enhance his sentence.  Finally, Foster argues that the District Court erred by applying U.S.S.G. § 2K2.1(c)(1) to enhance his sentence.  None of those challenges warrants changing the results of the trial or sentencing proceedings.

---

[7] Foster was convicted of those crimes after a jury trial in the Eastern District of Pennsylvania.  He challenged his conviction in that case in a separate appeal.  *See United States v. Foster*, No. 17-1902 (3d Cir.).

[8] The District Court had jurisdiction under 18 U.S.C. § 3231.  We have appellate jurisdiction pursuant to 18 U.S.C. § 3742 and 28 U.S.C. § 1291.

13

## A. There Was Reasonable Suspicion to Stop Payton.[9]

Payton argues that the District Court erred in denying his motion to suppress evidence discovered as a result of McColgan's detaining him. He argues that McColgan did not have reasonable suspicion to stop him because the only identifying information available before the seizure was that a black male had fled the Branmar Plaza parking lot. Although Payton is correct that that was the only identifying information, it was not the only relevant information known to McColgan at the time he made the stop. We agree with the District Court that the totality of the circumstances known to McColgan, combined with his experience as a law enforcement officer, provided him with reasonable, articulable suspicion to stop Payton.

A law enforcement officer "may constitutionally conduct a brief, investigatory stop and frisk … if he has a reasonable, articulable suspicion that criminal activity is afoot." *United States v. Graves*, 877 F.3d 494, 498 (3d Cir. 2017) (quotation marks, editorial marks, and citation omitted). Such a detention is often called a "*Terry* stop," after the well-known Supreme Court decision in *Terry v. Ohio*, 392 U.S. 1 (1968). Reasonable suspicion must exist at the time of a *Terry* stop. *United States v. Brown*, 448 F.3d

---

[9] "We review the District Court's order granting a motion to suppress for clear error with respect to the underlying factual findings, but we exercise plenary review over legal determinations." *United States v. Mallory*, 765 F.3d 373, 381 (3d Cir. 2014) (quotation marks and citation omitted).

239, 245 (3d Cir. 2006). Information acquired after the initial seizure is not relevant to the reasonable suspicion analysis. *United States v. Goodrich*, 450 F.3d 552, 559 (3d Cir. 2006). To meet the reasonable suspicion standard, an officer needs only "a minimal level of objective justification[.]" *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000). "The officer must be able to articulate more than an inchoate and unparticularized suspicion or hunch of criminal activity." *Id.* at 123-24 (internal quotation marks and citation omitted). And even a stop "that is supported by reasonable suspicion … may nonetheless violate the Fourth Amendment if it is excessively intrusive in its scope or manner of execution." *United States v. Johnson*, 592 F.3d 442, 451 (3d Cir. 2010).

We afford significant deference to a law enforcement officer's determination of reasonable suspicion. Police are allowed to utilize "their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." *Graves*, 877 F.3d at 499 (internal quotation marks and citation omitted). "[A] trained officer may find reasonable suspicion 'based on acts capable of innocent explanation.'" *Id.* (citation omitted). "[W]e must consider the totality of the circumstances, including the police officer's knowledge, experience, and common sense judgments about human behavior." *United States v. Robertson*, 305 F.3d 164, 167 (3d Cir. 2002); *see also Graves*, 877 F.3d at 498 (emphasizing that courts must look to "the totality of the circumstances leading up to the moment of the defendant's seizure" when assessing reasonable suspicion).

15

The facts relevant to our reasonable suspicion analysis are not in dispute. On February 5, an e-mail was sent to Delaware State Troopers referencing two potentially "armed and dangerous" black men in a stolen Honda Accord at Branmar Plaza. (App. at 301.) The following morning, February 6, Yeldell observed two black men in the same car and at the same location. When he and other troopers approached the car, there was only one man, Foster, next to it. After detaining Foster and discovering that he was armed, Yeldell radioed to other police officers that the second suspect was at large. The radio message did not provide any precise description of the suspect, such as defining physical traits or clothing. By way of physical description, the officers receiving the radio alert knew only that they were looking for a potentially armed black male leaving on foot from Branmar Plaza.

Payton thus frames the issue at hand as a police officer pulling over the first black man he saw after hearing a report that a black suspect was at large. If viewed in isolation, we agree that so general a description could not support reasonable suspicion. Our case law is clear – "an excessively general description … in the absence of corroborating observations by the police[] does not constitute reasonable suspicion[.]" *Brown*, 448 F.3d at 252; *see also, e.g.*, *United States v. Arthur*, 764 F.3d 92, 99 (1st Cir. 2014) ("Let us be perfectly clear. Ubiquitous or vague physical descriptions … , without more, are not enough to support reasonable suspicion."); *United States v. Bailey*, 743 F.3d 322, 349 (2d Cir. 2014) ("[G]eneric descriptions of race, gender, and build, without more, have been held insufficient to justify reasonable suspicion."). But we cannot and do not view that description in isolation. We must view it in light of the

16

totality of the circumstances known to McColgan at the time he made the stop and with due deference to his fourteen years of experience patrolling the area surrounding Branmar Plaza.

The totality of the circumstances here includes the following. McColgan received the radio call from Branmar Plaza and quickly worked to coordinate a search perimeter with other law enforcement officers. Within approximately six minutes of receiving the alert, he observed a black male, Payton, walking along a road and coming from the direction of Branmar Plaza. Payton was walking calmly with a soda in his hand. McColgan followed Payton for approximately four minutes and observed him walk a short distance beyond the commercial establishments towards a stretch of road with only residences. At the time McColgan made the *Terry* stop, no law enforcement officer had observed any other pedestrians in the defined search area matching the suspect's description. The suppression hearing established that McColgan was familiar with the area, that McColgan did not recognize Payton as being from the area, that it was rare for individuals to be walking along the stretch of road where Payton was walking, that it was a relatively high-speed road with no sidewalk at that point, and that the two people McColgan did see from time to time walking along that stretch of road were two white adults with special needs.

"[R]elevant circumstances" like those known to McColgan can overcome a "vague and imprecise description[.]" *Goodrich*, 450 F.3d at 553. We have previously identified a non-exclusive set of four factors that may cumulatively overcome a "general or indefinite description," namely, "(1) the reputation of the area [where] the stop occurred …; (2) the time of day [the suspect was

17

stopped]; (3) the geographical and temporal proximity of the stop to the scene of the alleged crime; and (4) the number of persons in the area." *Id.* at 560-61. Those points "must be considered alongside any other relevant factors[.]" *Id.* at 561. The prior experience of the officer conducting the stop can serve to strengthen or weaken the weight afforded to any particular factor or factors.

A mid-morning stop in a residential area with no reported reputation for criminal activity can weigh against a reasonable suspicion determination. *See id.* (explaining that constitutional concerns arise when "the police perform a *Terry* stop in an otherwise tranquil neighborhood during the daylight hours based only on a general description"). But we do not ignore context. McColgan knew that a potentially armed suspect had just fled from a nearby stolen vehicle. The trooper observed Payton within a defined search area set up to locate the missing suspect. He saw Payton very soon after the suspect was reported missing and within two-tenths of a mile of the stolen car. After locating Payton within close geographic and temporal proximity of the last sighting of the suspect, McColgan confirmed with other officers that no other pedestrian matching the description, generic as it was, had been observed in the search area.

On top of the facts he learned that day, McColgan's fourteen years of experience patrolling the area around Branmar Plaza must be accounted for when weighing whether it was reasonable for him to view Payton's presence as suspicious. Deference is owed McColgan's knowledge that it was rare to see anybody other than two white special needs adults walking along the stretch of road where Payton was stopped. Although an untrained person not familiar with the

18

area might have viewed Payton's behavior as unremarkable, McColgan's experience gave him reason to think otherwise. When he ultimately stopped Payton, he was acting on more than an inchoate hunch of criminal activity premised on an individual matching a generic description.

The geographic and temporal proximity of Payton to the stolen car and the lack of any other suspect matching the general description of the suspect, along with McColgan's long experience and familiarity with the area, combine to show there was indeed constitutionally sufficient, reasonable, and articulable suspicion to stop Payton, even if the stop did occur mid-morning in a relatively crime-free area. *Cf. United States v. Quinn,* 812 F.3d 694, 699 (8th Cir. 2016) ("We have held that generic suspect descriptions and crime-scene proximity can warrant reasonable suspicion where there are few or no other potential suspects in the area who match the description."); *Arthur*, 764 F.3d at 98 (explaining that a law enforcement officer was entitled to rely on generic descriptions of two suspects "in combination with other clues" such as "the suspects' close proximity to the crime scene, the direction in which the men were headed, and the dearth of others in the critical … area").[10]

---

[10] Payton argues that our decision in *United States v. Brown*, 448 F.3d 239 (3d Cir. 2006), compels us to conclude otherwise. We disagree. *Brown* involved an unreliable location tip and a generic description of two suspects, which led a police officer to stop two black males simply because they were the only two black males at the given location. *Id.* at 241-43, 248-51. Because of those factors, we held that the generic descriptions provided to the police did not give rise to reasonable suspicion. *Id.* at 252. In short, the totality of the

Payton further argues, however, that his *Terry* stop was not reasonable as conducted because he was handcuffed and transported back to Branmar Plaza for identification purposes. A *Terry* stop must be "minimally intrusive" and tailored by police to "diligently pursue[] a means of investigation that [is] likely to confirm or dispel their suspicions quickly[.]" *United States v. Sharpe*, 470 U.S. 675, 685-86 (1985) (citation omitted). The reasonableness of a *Terry* stop's scope is case-specific and, again, judged by the totality of the circumstances. *Johnson*, 592 F.3d at 452. Although Payton claims that the officers made "no attempt to investigate or use less intrusive means to determine if Mr. Payton was involved in the Branmar Plaza incident" (Payton Opening Br. at 47), he has suggested no alternative means the officers could have used and cites no legal authority supporting his position that the officers' actions were unreasonable under the circumstances.

Here, the officers conducting the *Terry* stop had received an alert that a potentially armed suspect was missing. Placing Payton in handcuffs while confirming that he was not armed and dangerous was not outside the scope of a reasonable *Terry* stop. *See Johnson*, 592 F.3d at 448 (explaining that "placing a suspect in handcuffs while securing a location or conducting an investigation [does not] automatically transform an otherwise-valid *Terry* stop" into an unreasonable *Terry* stop). Nor was it unreasonable to transport Payton the very short distance back to Branmar Plaza. *See United States v. McCargo*, 464 F.3d 192, 198 (2d

---

circumstances in *Brown* was insufficient to overcome the generic description of the suspects. That is not the case here.

20

Cir. 2006) ("[I]n some circumstances, police may transport a suspect short distances in aid of a *Terry* stop."). Yeldell was still there and it was appropriate to bring Payton to him since that was the course of action most "likely to confirm or dispel their suspicions quickly[.]" *Sharpe*, 470 U.S. at 686. Thus, McColgan and his colleagues acted within the scope of a proper *Terry* stop.

Accordingly, we will affirm the District Court's denial of Payton's motion to suppress evidence obtained as a result of the *Terry* stop.

> **B.    The District Court Did Not Abuse Its Discretion When It Permitted the Barbershop Employees' Testimony Pursuant to Rule 404(b).**[11]

The District Court allowed the government to introduce the barbershop employees' testimony regarding

---

[11]   We review a district court's evidentiary rulings for an abuse of discretion. *United States v. Repak*, 852 F.3d 230, 240 (3d Cir. 2017). "An abuse of discretion occurs only where the district court's decision is arbitrary, fanciful, or clearly unreasonable—in short, where no reasonable person would adopt the district court's view." *United States v. Green*, 617 F.3d 233, 239 (3d Cir. 2010) (quotation marks and citation omitted). We exercise plenary review over a district court's interpretation of the Federal Rules of Evidence, which includes "whether evidence falls within the scope of Rule 404(b)." *United States v. Steiner*, 847 F.3d 103, 110-11 (3d Cir. 2017) (citation omitted).

their observations on February 5 of the men in the Honda Accord, over Foster's and Payton's objections that the testimony was speculative, not relevant to the events of February 6, and unduly prejudicial. We discern no error in that decision.

Rule 404(b) precludes a party from introducing "[e]vidence of a crime, wrong, or other act … to prove a person's character," but permits the introduction of such evidence if it is used "for another purpose, such as proving motive[.]" Fed. R. Evid. 404(b). We have been clear that "Rule 404(b) is a rule of general exclusion, and carries with it no presumption of admissibility." *United States v. Caldwell*, 760 F.3d 267, 276 (3d Cir. 2014) (quotation marks and citation omitted). It "must be applied with careful precision, and … evidence of a defendant's prior bad acts is not to be admitted unless both the proponent and the District Court plainly identify a proper, non-propensity purpose for its admission." *Id.* at 274.

The proponent of Rule 404(b) evidence carries the burden to meet a four-step test: "(1) the other-acts evidence must be proffered for a non-propensity purpose; (2) that evidence must be relevant to the identified non-propensity purpose; (3) its probative value must not be substantially outweighed by its potential for causing unfair prejudice to the defendant; and (4) if requested, the other-acts evidence must be accompanied by a limiting instruction." *United States v. Repak*, 852 F.3d 230, 241 (3d Cir. 2017). Foster and Payton declined a limiting instruction on the basis that no such instruction could "be crafted that would not tend to legitimatize the fact that there may have been a robbery

22

planned." (App. at 503.) Accordingly, we address only the first three elements of Rule 404(b)'s admissibility test.

### 1. Non-Propensity Purpose

Evidence of uncharged wrongful acts satisfies the non-propensity step for Rule 404(b) admissibility when it is admitted for a purpose "that is 'probative of a material issue other than character.'" *United States v. Green*, 617 F.3d 233, 250 (3d Cir. 2010) (quoting *Huddleston v. United States*, 485 U.S. 681, 686 (1988)). Simply invoking a non-propensity purpose "does not magically transform inadmissible evidence into admissible evidence." *Caldwell*, 760 F.3d at 276 (citation omitted). Rather, the testimony concerning other acts must "materially advance the prosecution's case." *United States v. Brown*, 765 F.3d 278, 291 (3d Cir. 2014). In determining whether it does so, "courts should consider the material issues and facts the government must prove to obtain a conviction." *Caldwell*, 760 F.3d at 276 (quotation marks and citation omitted).

The District Court ruled the barbershop employees' testimony admissible primarily because the Court considered it as proper proof of motive under Rule 404(b). It observed that "[n]umerous courts of appeals, including the Third Circuit, have concluded that Rule 404(b) other acts evidence is admissible to show motive in § 922(g)(1) cases[.]" (App. at 36); *see United States v. Lee*, 612 F.3d 170, 187 n.19 (3d Cir. 2010) (explaining in a felon-in-possession case that "it is highly relevant to show that a defendant had a motivation to commit the crime for which he is being charged"). In particular, it explained that allowing the testimony advanced the government's case because it supported the government's

23

"'casing businesses' motive, which in turn [made] it more likely that [Foster and Payton] each possessed a firearm on February 6, 2015." (App. at 36); *see also Brown*, 765 F.3d at 291-92 (explaining that the government must prove that "the defendant knowingly possessed the firearm" to obtain a conviction under § 922(g)(1)).

While they obviously deny any illicit motive, neither Foster nor Payton suggests that the District Court erred in determining that motive was a proper non-propensity purpose for admitting testimony under Rule 404(b), and we too are persuaded that the government satisfied the first element of Rule 404(b)'s admissibility test.

## 2. Relevance

In addition to identifying a proper purpose, the proponent of Rule 404(b) testimony must establish the relevance of the evidence to that purpose. *Brown*, 765 F.3d at 292. That requires the proponent to demonstrate how the proffered evidence fits into a logical chain of inferences, no link "of which is the inference that the defendant has a propensity to commit [the] crime." *United States v. Steiner*, 847 F.3d 103, 111 (3d Cir. 2017) (citation omitted). The proponent must also show that the proffered evidence would allow a "jury [to] reasonably conclude that the [prior] act occurred and that the defendant was the actor." *Huddleston*, 485 U.S. at 689. In determining whether a jury could reasonably reach such a conclusion, we "examine[] all the evidence in the case" because "[i]ndividual pieces of evidence, insufficient in themselves to prove a point, may in cumulation prove it." *Id.* at 690-91. At bottom, "[r]elevance is a relationship between the evidence and a material fact at issue which must be demonstrated by reasonable inferences

that make a material fact more probable or less probable than it would be without the evidence." *United States v. Sampson*, 980 F.2d 883, 888 (3d Cir. 1992).

Foster and Payton argue that the barbershop employees' testimony was not relevant because it was purely speculative, failed to identify either Foster or Payton as being present in the Accord on February 5, and required the jury to make an impermissible inference that "suspicious" black males have the propensity to possess firearms. They presented similar arguments to the jury, contending that the testimony concerning February 5, which did not identify either defendant, had no relevance to the events of February 6 and should be afforded no weight. That perfectly legitimate litigation strategy does not, however, dictate whether evidence meets Rule 404(b)'s relevancy requirement. *Id.* That determination is made by assessing whether, viewed in the context of all the evidence in the case, the Rule 404(b) evidence made a material fact more or less probable.

Here, the District Court's ruling laid out the logical chain of inferences explaining why the barbershop employees' testimony made it more probable that Foster and Payton each possessed a gun on February 6. As the Court explained, testimony concerning the events of February 5, viewed with other evidence in the case, showed that (i) two black males in a silver Honda Accord were "scoping out" Branmar Plaza on February 5; (ii) the suspicious activity prompted barbershop employees to photograph the car and its license plate and to contact police; (iii) police discovered that the Accord had been stolen; (iv) Trooper Yeldell later observed the same stolen Accord in the same parking lot "with two black male occupants who appeared to be

25

feverishly looking about the shopping center"; (v) law enforcement then found Foster outside of the Accord with a gun on his person; and (vi) a search of the Accord revealed an additional firearm on the back seat. (App. at 35-36 (quotation marks and citations omitted).) No step in that chain of inferences required an impermissible inference about the defendants' propensity to possess firearms. Rather, it helped establish the defendants' motive for possessing firearms on February 6. Moreover, evidence at trial established that Yeldell identified Payton as the driver of the stolen Accord on February 6, Foster as the passenger, and that items commonly used when committing a robbery were found in the car.

One can imagine a scenario in which two men show up in a small shopping plaza parking lot in a stolen car and case the stores in a way that arouses suspicion, and then, one day later, two different men do the exact same thing at the same place in the same car. That is a stretch, but imaginable. Yet the totality of the evidence was certainly sufficient to allow a jury to reasonably conclude that Foster and Payton were the individuals in the Accord on February 5, and hence the barbershop employees' testimony had relevance to motive. There was no error in the District Court's conclusion that the government met the second element of Rule 404(b)'s admissibility test.

### 3. Undue Prejudice

Rule 404(b) evidence must also meet Rule 403's balancing test. *Steiner*, 847 F.3d at 111. Rule 403 instructs courts to exclude evidence "if its probative value is substantially outweighed by a danger of … unfair prejudice, confusing the issues, [or] misleading the jury[.]" Fed. R.

26

Evid. 403. "[W]hen evidence is highly probative, even a large risk of unfair prejudice may be tolerable." *United States v. Bailey*, 840 F.3d 99, 119 (3d Cir. 2016) (quotation marks and citations omitted). We afford significant deference to a trial court's Rule 403 evidentiary rulings, *United States v. Finley*, 726 F.3d 483, 491 (3d Cir. 2013), and we agree with the District Court here that the prejudicial effect of the barbershop employees' testimony on Foster or Payton did not substantially outweigh its probative value.

The testimony in question was significant as to both Foster and Payton because it supported the government's theory that the defendants had a motive to possess firearms on February 6. At trial, Foster contested the government's assertion that he had actual possession of a gun on February 6. He said that law enforcement officers falsely testified that a gun flew out of his hand, and that the police had planted the gun at the scene. Given that defense, the government was entitled to rebut Foster's argument by presenting evidence of his motive for possessing a gun that day. *See Lee*, 612 F.3d at 187 n.19 ("In a case like this, where [the defendant] is asserting that he never had a gun on the day in question, it is important to know that he had a personal motivation to possess a gun.").

The government's constructive possession case against Payton, meanwhile, required it to prove that he had knowledge of the rifle found on the back seat of the Accord. *Brown*, 765 F.3d at 292. We have recognized that "[e]vidence of knowledge … is critical in constructive possession cases[.]" *Id.* (some alterations in original). The government's use of the barbershop employees' testimony to demonstrate that Payton was motivated to possess a gun on

February 6, and therefore had knowledge of its existence on the back seat of the car he was seen driving, was key to the government's constructive possession case against Payton. *Cf. Lee*, 612 F.3d at 186-87 (explaining that knowledge was not a critical part of a case against the defendant because the trial was not about whether the defendant "knew that he had a rifle in the back seat of his [car]").

Foster argues that the barbershop employees' testimony, and the government's reliance on that testimony throughout the trial, could have misled the jury into convicting the defendants for conspiring to commit robbery, when they were only charged with unlawful possession of a firearm. We do not share that concern. The verdict sheet explicitly referenced the charged offenses – unlawful possession of a firearm by a felon – and the District Court, referencing that form, instructed the jury to convict if they found "that the government ha[d] proved either of the defendants guilty on [that] charge beyond a reasonable doubt[.]"[12] (App. at 938.) That instruction was clear, and we presume it was followed. *Richardson v. Marsh*, 481 U.S. 200, 211 (1987); *United States v. Hodge*, 870 F.3d 184, 205 (3d Cir. 2017). The District Court thus did not err in its conclusion that the government met the third element of Rule 404(b)'s admissibility test.

In sum, the Court made a reasonable determination to admit the barbershop employees' testimony because that

---

[12] The Court's instructions and verdict sheet made clear that the jury was to consider the evidence as to each defendant individually.

evidence was introduced to prove motive, was relevant, was highly probative, and was not unduly prejudicial.

### C. Sufficient Evidence Supported the Jury's Verdict Against Payton.[13]

The government presented sufficient evidence during the trial for a rational jury to convict Payton of constructive possession of a firearm by a felon, in violation of 18 U.S.C. § 922(g)(1). Payton's argument that the government relied on nothing but his proximity to the rifle found on the Accord's back seat to prove constructive possession ignores circumstantial evidence connecting him to the rifle.

Section 922(g)(1) required the government to prove beyond a reasonable doubt that "(1) [Payton] ha[d] been convicted of a crime of imprisonment for a term in excess of one year; (2) [Payton] knowingly possessed the firearm; and (3) the firearm traveled in interstate commerce." *United States v. Huet*, 665 F.3d 588, 596 (3d Cir. 2012). Payton stipulated to the first and third elements, so the only element at issue was whether he knowingly possessed the gun found

---

[13] When reviewing a sufficiency-of-the-evidence challenge to a jury verdict, "[w]e review the evidence in the light most favorable to the government. We do not reweigh the evidence or assess witness credibility." *Hodge*, 870 F.3d at 204 (citation omitted). Our sole task is to determine "whether the jury's verdict is permissible." *Id.* (citation omitted). Our governing standard is "whether 'a rational trier of fact could have found the defendant guilty beyond a reasonable doubt, and the verdict is supported by substantial evidence.'" *Id.* (brackets and citation omitted).

in the Accord. Because he was not found in actual possession of a firearm, the government's case against him proceeded on a constructive possession theory. *See Caldwell*, 760 F.3d at 278 (explaining that the government can prove a § 922(g)(1) conviction in two ways: actual possession or constructive possession). "Constructive possession may be proved by circumstantial evidence." *United States v. Iglesias*, 535 F.3d 150, 156 (3d Cir. 2008).

To establish that Payton had constructive possession of the rifle, the government had to demonstrate that he knew of the rifle and that "he exercised dominion or control over the" Accord's back seat. *Caldwell*, 760 F.3d at 278; *see also United States v. Iafelice*, 978 F.2d 92, 96 (3d Cir. 1992) ("Constructive possession exists if an individual knowingly has both the power and the intention at a given time to exercise dominion or control over a thing, either directly or through another person or persons." (quotation marks and citation omitted)). Factors we have considered when determining whether the government has proven dominion or control include "evidence that the defendant attempted to hide or to destroy the contraband, … that the defendant lied to police about his identity," and the defendant's proximity to the prohibited item. *United States v. Jenkins*, 90 F.3d 814, 818 (3d Cir. 1996) (citation omitted); *see also United States v. Walker*, 545 F.3d 1081, 1088 (D.C. Cir. 2008) ("Proximity to a weapon, coupled with some other factor such as connection with a gun, proof of motive, a gesture implying control, evasive conduct, or a statement indicating involvement in an enterprise may suffice to show dominion and control over a weapon." (quotation marks and citation omitted)). Constructive possession cannot be proven by proximity alone; there must be "other proof" linking the

defendant to the prohibited item. *Jenkins*, 90 F.3d at 820; *accord United States v. Benjamin*, 711 F.3d 371, 376-77 (3d Cir. 2013).

Contrary to Payton's argument, the evidence before the jury sufficiently established the "other proof" necessary to show dominion or control. A barbershop employee observed two suspicious black males in a silver Honda Accord on February 5, whom he perceived to be "up to no good." (App. at 544-45.) The following morning, on February 6, Yeldell observed Payton in the driver's seat of that same car in the Branmar Plaza parking lot, a car that police by then knew was stolen. A subsequent search of the car revealed a gun case containing a rifle in plain view on the back seat. The search also revealed rolls of duct tape, gloves, and a drawstring bag. After Payton saw police arrive at Branmar Plaza, he fled the scene, and after he was stopped, he provided false identification information to the police.

Viewed in the light most favorable to the government, that evidence demonstrated more than just Payton's proximity to the rifle. The government set forth a plausible motive for Payton to possess the gun – armed robbery – that was supported by the items recovered from the Accord. The evidence also established Payton's evasive conduct, and Yeldell's testimony that he saw Payton in the driver's seat of the Accord further supported a finding that Payton exercised dominion or control over the interior of the Accord, *see Walker*, 545 F.3d at 1088 (stating that drivers are "held to a higher level of accountability for" contraband found in a car) (citation omitted).

Accordingly, we will not disturb the jury verdict convicting Payton of unlawful possession of a firearm.

### D. Payton's Sentence Was Properly Enhanced Pursuant to U.S.S.G. § 2K2.1(b)(6)(B).[14]

Payton argues that the District Court erred in applying the § 2K2.1(b)(6)(B) enhancement after it concluded that he used a firearm in connection with another felony offense. He contends that the evidence presented during trial and at sentencing was insufficient to show he was involved in an offense separate from his gun possession conviction because the barbershop employees' testimony did not identify him as being present on February 5. The District Court saw it differently, and so do we.

At this point, we are not dealing with a "beyond a reasonable doubt" standard. "The government bears the burden of proving by a preponderance of the evidence that a sentencing enhancement applies," *United States v. Napolitan*, 762 F.3d 297, 309 (3d Cir. 2014), and the evidence used at sentencing is "subject to a due process standard of reliability." *United States v. Paulino*, 996 F.2d 1541, 1547 (3d Cir. 1993); *see also United States v. Roman*, 121 F.3d 136, 141 (3d Cir. 1997) (explaining that the government can only meet its "burden by presenting reliable and specific evidence" (citation omitted)).

---

[14] "[W]e review the District Court's interpretation of the Sentencing Guidelines *de novo*," "findings of fact for clear error[,]" and "application of the [g]uidelines to facts for abuse of discretion." *United States v. Kluger*, 722 F.3d 549, 555 (3d Cir. 2013) (citations omitted).

Section 2K2.1(b)(6)(B) provides, in relevant part, for an enhancement "[i]f the defendant … used or possessed any firearm … in connection with another felony offense[.]" U.S.S.G. § 2K2.1(b)(6)(B). A sentencing court can apply the § 2K2.1(b)(6)(B) enhancement only if it determines that a defendant "[u]sed or possessed any firearm or ammunition in connection with another felony offense." *United States v. Harris*, 751 F.3d 123, 127-28 (3d Cir. 2014) (alteration in original). In making that determination, courts can consider relevant and reliable "information without regard to its admissibility under the rules of evidence applicable at trial[.]" U.S.S.G. § 6A1.3. The District Court applied that enhancement after finding that Payton was conspiring with Foster to rob a store in Branmar Plaza on the morning of February 6, the day of his arrest. For purposes of the enhancement, the Court did not "think it matter[ed] whether [Payton] was present" on February 5 (App. at 1083), because it determined that the totality of the circumstances led to "no reasonable conclusion … other than the two defendants were casing the business in the Branmar Shopping Center with the intent to rob it," (App. at 1088). Moreover, the evidence established by a preponderance that his co-conspirator, Foster, was present on both February 5 and February 6 to case stores in Branmar Plaza. In addition, the Court referred to video surveillance evidence not admitted at trial, but that was properly considered at sentencing, that Foster was also at Branmar Plaza on January 19 casing businesses. Then, on February 6, Payton and Foster were sitting in a stolen car in the same shopping center parking lot, with "no apparent reason" for being there and with "almost nothing with them other than useful tools for a robbery, including the two loaded weapons, the backpack along with the two rolls of duct tape,

33

[and] the gloves[.]" (App. at 1089.) And, as the Court highlighted, Payton fled the scene on February 6 after "realiz[ing] the police were there." (App. at 1089.)

Payton has not pointed to anything in the record disputing the accuracy of the findings described above or to any evidence leaving us "with the definite and firm conviction that a mistake has been committed." *United States v. Grier*, 475 F.3d 556, 570 (3d Cir. 2007) (citation omitted). We therefore conclude that the District Court's factual findings were not clearly erroneous and there was no error when it applied § 2K2.1(b)(6)(B) to enhance Payton's sentence.

**E.  The District Court Did Not Plainly Err When It Enhanced Foster's Sentence Pursuant to U.S.S.G. § 2K2.1(c)(1).**[15]

Similarly, the District Court did not commit plain error when it enhanced Foster's sentence pursuant to U.S.S.G. § 2K2.1(c)(1).  That guideline provides, in relevant part, for an enhancement "[i]f the defendant used or possessed any firearm … cited in the offense of conviction in connection with the commission or attempted commission of another offense[.]"  U.S.S.G. § 2K2.1(c)(1).  Section 2K2.1(c)(1) was amended in 2014 to limit its application only to instances in which the defendant used the exact same firearm "cited in the offense of conviction" in connection with another offense.  U.S.S.G. Supp. to App. C, Amend. 784, Reason for Amendment.

---

[15]  We apply plain error review to Foster's appeal of the § 2K2.1(c)(1) enhancement because he did not preserve his objection below.  Under plain error review, an appellate court can correct an error not raised at trial where (1) the district court erred; (2) the error was clear or obvious; and (3) the "error 'affected the appellant's substantial rights,'" which typically means that there is a reasonable probability that the error affected the outcome of the proceedings.  *United States v. Stinson*, 734 F.3d 180, 184 (3d Cir. 2013) (quoting *Puckett v. United States*, 556 U.S. 129, 135 (2009)).  If those three conditions are met, we then have discretion to remedy the error, and we exercise this discretion "only if the error seriously affects the fairness, integrity, or public reputation of judicial proceedings."  *Id.* (quoting *Puckett*, 556 U.S. at 135 (alteration omitted)).

Foster contends that the government did not meet its burden to introduce reliable evidence sufficient to support the § 2K2.1(c)(1) enhancement. It is well established, though, "that a sentencing court may rely on the facts set forth in the presentence report when their accuracy is not challenged by the defendant." *United States v. Watkins*, 54 F.3d 163, 166-67 (3d Cir. 1995); *see also* Fed. R. Crim. P. 32(i)(3)(A) ("At sentencing, the court … may accept any undisputed portion of the presentence report as a finding of fact[.]").

Foster argues that the District Court erred when it applied the § 2K2.1(c)(1) enhancement because it relied "on an unsupported and unsupportable assertion in the [PSR]." (Foster Opening Br. at 13.) His argument depends primarily on a line of cases from the United States Court of Appeals for the Fifth Circuit holding that "[b]ald, conclusionary statements do not acquire the patina of reliability by mere inclusion in the PSR." *United States v. Elwood*, 999 F.2d 814, 817-18 (5th Cir. 1993).[16] That authority is

---

[16] *See also United States v. Zuniga*, 720 F.3d 587, 591 (5th Cir. 2013) ("If the factual recitation [in the PSR] lacks sufficient indicia of reliability, then it is error for the district court to consider it at sentencing—regardless of whether the defendant objects or offers rebuttal evidence." (alteration in original) (citation omitted)); *United States v. Taylor*, 277 F.3d 721, 724 (5th Cir. 2001) ("The PSR … cannot just include statements, in the hope of converting such statements into reliable evidence, without providing any information for the basis of the statements." (citation omitted)); *United States v. Shacklett*, 921 F.2d 580, 584 (5th Cir. 1991) (explaining that a probation officer's unsupported assertion in a PSR as to drug quantity amount had "no indicia of reliability,"

distinguishable, however, because each of those cases involved either a defendant who had objected to factual assertions contained in the relevant PSR or a PSR containing unsupported factual assertions. The Fifth Circuit has itself stressed that, "[g]enerally, a PSR bears sufficient indicia of reliability to permit the district court to rely on it at sentencing. … [T]he defendant has the burden to show that the information relied on in a PSR is inaccurate." *United States v. Taylor*, 277 F.3d 721, 724 (5th Cir. 2001) (internal citation omitted). Unlike the cases Foster cites, Foster did not object to the factual statements contained in the relevant PSRs, and the record contains sufficient evidence to support the District Court's determination – by a preponderance of the evidence – that the gun recovered during Foster's arrest in Delaware was the same gun used during robberies and a carjacking he committed in Pennsylvania.

The PSR stated that the Smith & Wesson .380 caliber semi-automatic pistol gun seized at Branmar Plaza was the same gun as the one Foster used during those earlier crimes. Foster did not object to that conclusion during his sentencing proceedings but on appeal characterizes it as unsupportable. He argues that the PSR in this case relied on the PSR prepared in connection with his Eastern District of Pennsylvania convictions and that that underlying PSR only identifies the gun used in Pennsylvania as being consistent with, rather than the same as, the one recovered in Delaware. Although Foster is correct on that point, the conclusion that the Smith & Wesson recovered in Delaware was the same

especially since the defendant objected to the PSR's drug quantity conclusion).

37

gun used in the Pennsylvania crimes is supported by at least three categories of direct and circumstantial evidence.

First, a relatively short time separated the crimes Foster committed in Pennsylvania, which took place in November and December 2014, from his Delaware arrest in February 2015. It is not unreasonable to conclude that Foster used the same gun over that time period and kept it in his possession to perpetrate future crimes. Second, there is surveillance video from each of the Pennsylvania robberies that allows the conclusion that the gun used in those crimes and the gun recovered in Delaware are the same. Third, although the victims of the robberies could not identify with certainty that the gun recovered in Delaware – and later shown to each of them during the Eastern District of Pennsylvania trial – was the same gun they were confronted with when robbed, they each agreed that the gun looked similar.[17] Those facts, coupled with Foster's failure to object

---

[17] Victim Kumar testified that he could not be sure that it was the same gun, but that "it looks like to me it's the same gun. But I can't tell you for 100 percent because I was so scared that day." (App. at 1025.) Victim Kabatt testified that, although he agreed the guns were "similar," he could not know for sure because he was scared and the perpetrator's hands obscured his view of the gun. (App. at 1028.) Victim Singh testified that the gun "could be [the same] because it's kind of [the] same size," but that he was not sure because the robbery had taken place a year-and-a-half prior and he had not thought "about that incident again since then." (App. at 1034.) Victim Borkowski testified that the gun looked "similar in size and color," (App. at 1038,) but he could not say for certain that it was the same gun.

to the PSR during his sentencing proceedings before the District Court, lead us to conclude that the District Court did not plainly err by applying § 2K2.1(c)(1) to enhance Foster's sentence.

## III.    Conclusion

For the foregoing reasons, we will affirm Foster's and Payton's convictions and sentences.