**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 16-3995

_____

UNITED STATES OF AMERICA

v.

SHAUN L. GRAVES,
                                    Appellant

_____

On Appeal from the United States District Court
for the Middle District of Pennsylvania
(D. C. Criminal No. 1-15-cr-00158-001)
District Judge: Honorable William W. Caldwell

_____

Argued on May 24, 2017

Before: HARDIMAN, ROTH and FISHER, Circuit Judges

(Opinion filed: December 13, 2017)

Ronald A. Krauss, Esq. (**ARGUED**)
Office of Federal Public Defender
100 Chestnut Street
Suite 306
Harrisburg, PA 17101

Counsel for Appellant

Stephen R. Cerutti, II, Esq. (**ARGUED**)
Office of United States Attorney
228 Walnut Street, P.O. Box 11754
220 Federal Building and Courthouse
Harrisburg, PA 17108

Counsel for Appellee

_____

OPINION

_____

ROTH, Circuit Judge

Shaun Graves appeals his conviction and sentence for unlawful possession of a firearm, arguing that his suppression motion was wrongfully denied and that he was improperly sentenced as a career offender. For the reasons set forth below, we will affirm both the conviction and the sentence.

# I. FACTS

On the evening of October 16, 2014, Officer Dennis Simmons of the Harrisburg Police Department was conducting an undercover surveillance operation in a high-crime area of the city while dressed in plainclothes and sitting in an unmarked car. While in his car, Officer Simmons heard a radio dispatch about possible gunshots in an unspecified area east of his location. The dispatch went on to describe two potential suspects walking away from the location of the gunshots: Both men wore dark-colored hooded sweatshirts and were described as calmly walking west, away from the gunshots. Less than five minutes later, Officer Simmons observed two men—including Graves—in dark-colored hooded sweatshirts walking west towards Simmons' vehicle. Officer Simmons then drove around the block to the next street in order to intercept the two men. At this point, he noticed Graves walking with a "pronounced, labored" gait suggesting that "he may have concealed something heavy in his waistband or pocket on [his right] side."[1] Officer Simmons also testified that Graves held his arms in a tense manner, further suggesting that he was armed.

As Graves and the other individual passed Officer Simmons' vehicle, Officer Simmons made eye contact with Graves; Graves raised his hands over his head in the shape of a Y, and Officer Simmons nodded. Officer Simmons testified at the suppression hearing that Graves' behavior "was consistent with a drug dealer or someone who sells something illegal in the street."[2] Officer Simmons admitted, however,

---

[1] JA 25.
[2] JA 27.

3

that "it could be more like a challenge, more or less someone saying what are you looking at, why are you looking at me that way."[3] Officer Simmons then proceeded to drive one block south and wait. Graves left his companion and turned south, walking directly towards Officer Simmons' car at a quickened pace. As Graves neared the vehicle, Officer Simmons displayed his badge, yelled "Police," and handcuffed Graves.

Believing that there was a possibility that Graves was armed, Officer Simmons conducted a pat-down search of Graves' clothing. During this pat-down, Officer Simmons felt "multiple small hard objects" in both of Graves' front pockets. The feel of these objects was consistent with that of crack cocaine.[4] Officer Simmons proceeded to remove the objects from Graves' pockets. They turned out to be multiple packets of the antidepressant Depakote[5] and one live .22 caliber bullet. At this point, other officers arrived. After being read his rights, Graves told Officer Simmons that he carried the bullet as a tribute to his brother, who had been killed by a .22 caliber weapon. Graves did not answer Officer Simmons' questions about whether he had a gun for the bullet. Officer Simmons then placed Graves in another officer's vehicle, and Graves was taken approximately two blocks south. Upon further questioning, Graves admitted that he had a loaded .380 pistol in his boot, where it had fallen

---

[3] *Id.*

[4] JA 31.

[5] Depakote, a prescription medication for certain mental health conditions, is not a controlled substance for purposes of federal law. Graves purportedly told Simmons, however, that he planned to sell the Depakote as crack cocaine.

4

from his waistband during his arrest. Graves maintained, however, that he was holding the gun only temporarily for his companion.

Graves was subsequently charged with one count of possession of a firearm with an obliterated serial number in violation of 18 U.S.C. §§ 922(k) and 924(a)(1)(B) and one count of unlawful possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1), 924(a)(2), and 924(e). He filed a motion to suppress all physical evidence and statements obtained at the time of his arrest.

At the suppression hearing before the District Court, Officer Simmons testified to the above facts, as well as about his nine years of experience as a police officer, during which he had made hundreds of arrests for drug offenses and violent crimes. After crediting Officer Simmons' testimony in its entirety, the District Court denied Graves' motion to suppress. Graves then entered a guilty plea to one count of unlawful possession of a firearm.[6] At sentencing, the District Court treated Graves as a career offender over Graves' objection, finding that his two prior convictions for North Carolina common law robbery were the categorical equivalent of the enumerated crime of robbery in § 2K2.1 of the U.S. Sentencing Guidelines. Applying this enhancement, the District Court sentenced Graves to a term of imprisonment of 100 months—the bottom of the Guidelines range.

---

[6] Graves' guilty plea was conditioned on his right to appeal the propriety of the denial of his motion to suppress and of the sentence imposed.

Graves appealed.

## II.  DISCUSSION[7]

Graves raises two issues on appeal.  First, he appeals the denial of his motion to suppress, arguing that Officer Simmons lacked reasonable suspicion to stop and frisk him or, in the alternative, that Officer Simmons exceeded the scope of a valid frisk by focusing on more than just potential weapons on his person.  Second, he appeals the District Court's decision to treat North Carolina common law robbery as the categorical equivalent of generic robbery and the resultant enhancement of his sentence.  We treat each issue in turn.  Because the facts underlying both issues are not in dispute, we need only determine their legal significance; our review of such legal questions is plenary.[8]

### A.  The Search

Graves advances two theories why Officer Simmons' behavior ran afoul of the Fourth Amendment.  First, he argues that Officer Simmons lacked reasonable suspicion to justify

---

[7] The District Court had jurisdiction over Graves' criminal prosecution pursuant to 18 U.S.C. § 3231.  We have jurisdiction over this appeal pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742.

[8] *See United States v. Pavulak*, 700 F.3d 651, 660 (3d Cir. 2012) (citation omitted) (suppression); *United States v. Johnson*, 587 F.3d 203, 207 (3d Cir. 2009) (citation omitted) (career offender enhancement).

stopping and frisking him.[9]   Second, he argues that Officer Simmons exceeded the proper scope of an investigatory search by searching him for drugs, rather than weapons.  Each argument is addressed separately.

Although the Fourth Amendment generally requires that a seizure be effectuated pursuant to a warrant supported by probable cause, an officer may constitutionally conduct a "brief, investigatory stop [and frisk]" without a warrant if he has "a reasonable, articulable suspicion that criminal activity is afoot."[10]   This "reasonable suspicion" standard is lower than probable cause; rather, an officer need only "a minimal level of objective justification"[11] that is "specific to the person who is detained."[12]   We review the totality of the circumstances leading up to the moment of the defendant's seizure.[13]   In doing so, however, we "give considerable deference to police officers' determinations of reasonable suspicion" given "their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well

---

[9] Although raised as two separate issues in Graves' brief, the standards governing both are identical in this case; as such, both are addressed together.

[10] *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000) (citation omitted).

[11] *United States v. Whitfield*, 634 F.3d 741, 744 (3d Cir. 2010) (considering "the totality of the circumstances" and taking into account "everything that occurred until the moment [the defendant] was seized . . .").

[12] *United States v. Navedo*, 694 F.3d 463, 468 (3d Cir. 2012).

[13] *Whitfield*, 634 F.3d at 744.

elude an untrained person.'"[14] Thus, a trained officer may find reasonable suspicion "based on acts capable of innocent explanation."[15]

Although Officer Simmons acted on limited information in stopping Graves, we nonetheless believe that the totality of the circumstances gave rise to reasonable suspicion. First, Officer Simmons explained that he was parked in a high crime area.[16] Second, Graves and his companion were leaving the scene of the gunshots dressed in similar garb to the suspects described in the police broadcast. Third, Officer Simmons observed Graves walking in a manner indicating, in Officer Simmons' experience, that Graves was armed.

While these factors standing in isolation may not have been sufficient,[17] together they satisfied the low threshold of reasonable suspicion—particularly in light of the close

---

[14] *United States v. Brown*, 765 F.3d 278, 290 (3d Cir. 2014) (citations omitted).

[15] *Whitfield*, 634 F.3d at 744 (internal quotation marks and citation omitted).

[16] *See Wardlow*, 528 U.S. at 124 (noting that location in a high crime area is "among the relevant contextual considerations" in determining the reasonableness of a stop).

[17] *See United States v. Brown*, 448 F.3d 239, 247-48 (3d Cir. 2006) (finding that the bare fact that defendants matched a generalized description of suspects as black men wearing dark sweatshirts insufficient to satisfy reasonable suspicion); *United States v. Ubiles*, 224 F.3d 213, 218 (3d Cir. 2000) (noting that evidence of gun possession may not, standing alone, be sufficient to create reasonable suspicion).

temporal proximity between the gunshots and Officer Simmons' encounter with Graves. Further, Officer Simmons' suspicions were increased when he observed Graves raise his arms over his head in a manner consistent with that of an individual seeking to sell drugs, or, in the alternative, looking at Officer Simmons in a challenging manner. Graves then departed from his companion to approach Officer Simmons' vehicle, quickening his pace. This combination of events gave rise to the reasonable inference by Officer Simmons that Graves was armed and engaged in potentially unlawful conduct.[18] On appeal, Graves advances innocent explanations for all his conduct and points to other evidence undercutting the likelihood that he was engaged in criminal activity. However, the mere possibility of such an innocent explanation does not undermine Officer Simmons' determination at the time.

Accordingly, we find that Officer Simmons had reasonable suspicion that criminal activity was underway when he stopped and frisked Graves.

However, when an officer exceeds the proper bounds of a search, an individual subject to a valid investigatory stop and frisk may nonetheless assert constitutional error. An officer may only "search . . . the outer clothing of [seized] persons in an attempt to discover weapons which might be

---

[18] *See United States v. Murray*, 821 F.3d 386, 393 (3d Cir. 2016) (finding that evidence of defendant's involvement in drug trafficking was sufficient to support reasonable suspicion that he was armed).

9

used to assault him."[19]   While "[t]he purpose of this limited search is not to discover evidence of crime," the Supreme Court has held that an officer "may seize contraband detected during the lawful execution of [such a] search" under the plain feel doctrine.[20]   Once the validity of a protective frisk is established, "the dispositive question . . . is whether the officer who conducted the search was acting within . . . lawful bounds . . . at the time he gained probable cause to believe that the lump in [the defendant's pocket] was contraband."[21] We must focus on "whether the officer had probable cause to believe an object was contraband before he knew it not to be a weapon and whether he acquired that knowledge in a manner consistent with a routine frisk."[22]

Graves argues that Officer Simmons was not entitled to conduct any further search of his person once Officer Simmons realized that the objects in his pockets were not weapons.  In so arguing, however, Graves advances a broad theory.  Graves proposes that if a police officer is conducting a protective frisk, by definition, he must determine if what he is feeling is a weapon.  Graves asserts that, if Officer Simmons determined that the right front pocket did not hold a weapon, his search of the interior of the pocket was impermissible; a determination that an object is not a weapon *must* end the search.

---

[19] *Navedo*, 694 F.3d at 467-68 (quoting *Terry v. Ohio*, 392 U.S. 1, 30 (1968) (second alteration in original)).
[20] *Minnesota v. Dickerson*, 508 U.S. 366, 373-75 (1993) (internal quotation marks and citation omitted).
[21] *Id.* at 377.
[22] *United States v. Yamba*, 506 F.3d 251, 259 (3d Cir. 2007) (emphasis removed) (citations omitted).

Our decision in *United States v. Yamba* forecloses this argument. There, an officer, conducting a protective frisk, felt a plastic bag containing a soft, "spongy-like" substance.[23] The officer's testimony that this "feeling" was, in his experience, consistent with the feeling of marijuana was sufficient to create probable cause justifying removal of the bag. We held that the removal of the bag did not exceed the bounds of a protective frisk merely because the officer knew that the bag itself contained no weapons; rather, we focused on whether the officer encountered the contraband "before he determined that Yamba had no gun on his person."[24]

The same result is compelled here. In conducting the frisk of Graves' pockets, Officer Simmons testified that he knew the materials in Graves' pockets were consistent in feeling with crack cocaine. The District Court credited this testimony. Indeed, Graves did not identify any other plausible explanations for the feeling of the objects in his pockets. The feel of these objects, in light of Officer Simmons' experience with narcotics investigations, gave rise to probable cause justifying removal of the objects from Graves' pocket. Moreover, because Officer Simmons had yet to determine whether Graves was armed at the time he felt the objects, his frisk did not run afoul of the Fourth Amendment.

Accordingly, we hold that Officer Simmons did not exceed the bounds of a valid protective frisk in removing the Depakote and bullet from Graves' pockets during the course of the search.

---

[23] *Id*. at 260.
[24] *Id.*

11

## B.  The Sentence

Graves next challenges his sentence on the ground that the District Court improperly sentenced him as a career offender after treating his two prior convictions for North Carolina common law robbery as the equivalent of the crime of generic federal robbery, as used in the Sentencing Guidelines.

Section 4B1.1 of the Sentencing Guidelines designates an offender as a "career offender" if, as relevant here, he has "at least two prior felony convictions of either a crime of violence or a controlled substance offense."[25]  The Guidelines define a "crime of violence" as an offense that "has as an element the use, attempted use, or threatened use of physical force against the person of another, or [] is murder, voluntary manslaughter, kidnapping, aggravated assault, a forcible sex offense, robbery, arson, extortion, or the use or unlawful possession of a firearm . . . or explosive material . . .."[26]

To determinations of whether a prior state court conviction constitutes a federally defined crime of violence, we apply the categorical approach,[27] *i.e.*, we compare the elements of the state offense, forming the basis of the defendant's conviction, with the elements of the "generic"

---

[25] U.S.S.G. § 4B1.1(a).

[26] U.S.S.G. § 4B1.2(a).  The offense must also be punishable by a term of imprisonment exceeding one year, but it is uncontested that North Carolina common law robbery satisfies this requirement.

[27] *Brown*, 765 F.3d at 188-89.

crime.[28] The prior conviction qualifies as a crime of violence only if the elements of the state offense "are the same as, or narrower than, those of the generic offense."[29] If, on the other hand, the state offense allows for conviction on a broader basis than the generic offense, it may not be considered for purposes of sentence enhancement.[30] Thus, we must first identify the elements of the state offense, then identify the elements of the generic offense, and finally determine whether the former are the same as or narrower than the latter.

The North Carolina Supreme Court has defined common law robbery as "the felonious, non-consensual taking of money or personal property from the person or presence of another by means of violence or fear."[31] North Carolina has delineated six necessary elements for common law robbery: (1) the taking away of property; (2) from the person or presence of another; (3) without consent; (4) with specific intent to permanently deprive the owner of the

---

[28] *Id.* at 189 (internal quotation marks and citation omitted).
[29] *Id*.
[30] *Id.*
[31] *State v. Smith*, 292 S.E.2d 264, 270 (N.C. 1982) (citations omitted).

13

property; (5) with knowledge of the property's ownership; and (6) through use of violence or putting the victim in fear.[32]

Only the final element—the use of violence or fear—is at issue here.[33] North Carolina's courts have interpreted this element as a "force" requirement, explaining that "[a]lthough actual force implies personal violence, the degree of force used is immaterial, so long as it is sufficient to compel the victim to part with his property or property in his

---

[32] N.C. Pattern Jury Instructions 217.10; *accord State v. Lunsford*, 49 S.E.2d 410, 412 (N.C. 1948). Some North Carolina courts appear to have collapsed the elements of lack of consent and specific intent into the first element. *See, e.g.*, *State v. Hedgecoe*, 415 S.E.2d 777, 780 (N.C. Ct. App. 1992) (citation omitted). The substantive elements, however, appear to remain unchanged.

[33] The government does not argue that the possibility that the offense be committed through use of violence or through use of fear renders North Carolina common law robbery a divisible offense, nor would we find any such argument convincing. North Carolina courts do not require that a jury unanimously agree as to whether a defendant used violence or used fear. *See* N.C. Pattern Jury Instructions 217.10; *see also United States v. Gardner*, 823 F.3d 793, 802-03 (4th Cir. 2016). Accordingly, the statute is indivisible, insofar as "violence" and "fear" are not alternative elements, but together form one element of the offense. *Id.*; *see Descamps v. United States*, 133 S. Ct. 2276, 2290 (2013) (noting that a statute is indivisible, even if it lists alternatives, if the jury need not agree as to the exact way in which the defendant committed the offense).

possession."[34] The parties agree that this interpretation means that a defendant may be convicted of North Carolina common law robbery even if he used only *de minimis* force, which posed no threat of injury to another. Convictions for common law robbery in North Carolina courts support this reading of the offense. In *State v. Chance*, for example, the North Carolina Court of Appeals affirmed a conviction where the only "force" demonstrated at trial was the defendant's act of pushing the victim's hands off of a box of cigarettes.[35] The Fourth Circuit Court of Appeals, which appears to be the only other circuit to consider North Carolina common law robbery, has reached the same conclusion.[36]

Accordingly, we find that North Carolina common law robbery requires only the use of *de minimis* force.

---

[34] *State v. Carter*, 650 S.E.2d 650, 653 (N.C. Ct. App. 2007) (quoting *State v. Sawyer*, 29 S.E.2d 34, 37 (N.C. 1944)) (emphasis removed).

[35] 662 S.E.2d 405 (Table), 2008 WL 2415981, at *3-*4 (N.C. Ct. App. 2008). Two U.S. district courts in Tennessee have found that North Carolina common law robbery requires more than *de minimis* force. *See Smith v. United States*, No. 2:03 CR 73, 2016 WL 7365634, at *4 (E.D. Tenn. Dec. 16, 2016), certificate of appealability denied, No. 17-5016, ECF No. 13 (6th Cir. Aug. 10, 2017); *United States v. Smith*, No. 3:13 CR 5, 2016 WL 6875877, at *5 (E.D. Tenn. Nov. 21, 2016). Both decisions have been appealed to the Sixth Circuit. We are not persuaded by the relatively cursory discussions of the issue in each opinion, particularly in light of North Carolina courts' repeated pronouncements on the issue.

[36] *Gardner*, 823 F.3d at 803-04.

Turning to generic robbery, as used in the Guidelines career offender enhancement, we must determine whether generic robbery requires the use of more than *de minimis* force. To identify the elements of the generic offense of robbery, we will examine the Model Penal Code (MPC), state laws, and learned treatises.[37] The MPC defines "robbery" as requiring one of three things to occur in the course of committing a theft: the offender must "(a) inflict[] serious bodily injury upon another; or (b) threaten[] another with or purposively put him in fear of immediate serious bodily injury; or (c) commit[] or threaten[] immediately to commit any felony of the first or second degree." Thus, the MPC requires that there be some actual or threatened injury to another person for a theft to qualify as robbery. It appears that eleven states follow this MPC framework, requiring some sort of actual or future injury for a theft to become robbery.[38] As the parties acknowledged, however, there are thirty-eight states which define robbery as theft involving the use of even *de minimis* force.[39]

---

[37] *See United States v. Marrero*, 677 F.3d 155, 165 (3d Cir. 2012), *cert. granted and judgment vacated on other grounds*, 133 S. Ct. 2732 (2013).

[38] *See United States v. Santiesteban-Hernandez*, 469 F.3d 376, 380 n.6 (5th Cir. 2006) (collecting statutes), *abrogated on other grounds by United States v. Rodriguez*, 711 F.3d 541 (5th Cir. 2013)

[39] *See id.* at 380 n.5; *see also* Oral Arg. Recording at 14:45-15:03,24:35-25:45, http://www2.ca3.uscourts.gov/oralargument/audio/16-3995USAv.Graves.mp3 (agreeing to number of state statutes which do not require more than minimal force).

This disjunction between the approach of the MPC and that of the substantial majority of states has led circuits to disagree whether generic robbery requires more than *de minimis* force. The Fifth Circuit Court of Appeals has suggested that the generic form of robbery requires something more than *de minimis* force, which involves risk of injury to another.[40] In so holding, it placed primary weight on the MPC definition of robbery, as well as the minority of state robbery statutes that include some element of injury. The Ninth Circuit Court of Appeals has come to the same conclusion, although it discussed the question only

---

[40] The Fifth Circuit, in one opinion, appeared to adopt the view that generic robbery required some risk of injury to the victim. *Santiesteban-Hernandez*, 469 F.3d at 380. Given that *Rodriguez* disavowed the methodology of *Santiesteban-Hernandez*, it is not clear whether the Fifth Circuit continues to believe that generic robbery requires more than *de minimis* force. Graves also cites to the Fourth Circuit's decision in *Gardner* for the proposition that generic robbery should require more than *de minimis* force. 823 F.3d at 803 (quoting *Johnson v. United States*, 559 U.S. 133, 139 (2010)). However, *Gardner* dealt only with the elements clause of the career offender enhancement, and thus only asked whether North Carolina common law robbery necessarily involved the use of violent force. *Gardner* did not consider the definition of the enumerated crime of generic robbery, as robbery was not added to the enumerated offenses clause until after the defendant's sentencing. Thus, although we have disagreed with the Fourth Circuit's reasoning in one previous case, *see United States v. Cornish*, 103 F.3d 302, 309 (3d Cir. 1997), we need not examine *Gardner* too closely here.

cursorily.[41]   The Seventh and Eleventh Circuit Courts of Appeals, however, have disagreed with this conclusion, finding that generic robbery comports with the majority of state robbery statutes in requiring only minimal force.[42]  We now join the Seventh and Eleventh Circuits and hold that generic robbery requires no more than *de minimis* force.

This is our first confrontation with a situation where the MPC's definition of a crime differs in an important respect from the approach taken by the significant majority of states.  Thus, we must determine which of these sources is entitled to greater weight in our definition of a generic crime.  A review of the Supreme Court's jurisprudence demonstrates the primacy of state statutes in defining the generic version of an offense.  In *Taylor v. United States*, for example, the Court appeared to place a greater weight on the approach of a majority of states.  The Court recognized, and rejected, the federal common law definition of burglary, finding the definition employed by the vast majority of states more

---

[41] *United States v. Becerril-Lopez*, 541 F.3d 881, 891 (9th Cir. 2008) (adopting the Fifth Circuit's rationale from *Santiesteban-Hernandez*).

[42] *See United States v. Lockley*, 632 F.3d 1238, 1244 (11th Cir. 2011) (citation omitted); *United States v. Duncan*, 833 F.3d 751, 755-56 (7th Cir. 2016) (reaffirming holdings predating *Descamps* that generic robbery is satisfied by any minor force, such as "a slap in the face").  The Sixth Circuit was faced with the question, but declined to answer it, as it held that the defendant had waived the argument on appeal.  *United States v. Elliott*, 757 F.3d 492, 496-97 (6th Cir. 2014).  As discussed *supra*, note 35, however, an appeal raising this issue is currently pending in the Sixth Circuit.

persuasive.[43]  The Sixth Circuit and the Ninth Circuit have read *Taylor* to place primary importance on the way the majority of states define a crime, even over the approach of the MPC.[44]

We agree with the Sixth Circuit and the Ninth Circuit in their reading of *Taylor*, and hold today that the most important factor in defining the generic version of an offense is the approach of the majority of state statutes defining the crime.  Affording predominant weight to the majority of states best recognizes that "Congress' basic goal in passing the Sentencing Act was to move the sentencing system in the direction of increased uniformity."[45]  While the MPC is a useful starting point, its definition of "robbery" does not

---

[43] 495 U.S. 575, 592-96 (1990).

[44] *United States v. Soto-Sanchez*, 623 F.3d 317, 322 (6th Cir. 2010) (citing *Taylor*, 495 U.S. at 598); *United States v. Garcia-Santana*, 774 F.3d 528, 534 (9th Cir. 2014) (reading *Taylor* to suggest that "[t]he generic definition of an offense roughly corresponds to the definitions of the offense in a majority of the States' criminal codes" (citation, internal quotation marks, and brackets omitted)).

[45] *United States v. Booker*, 543 U.S. 220, 253 (2005) (citations omitted).

supersede the way in which the majority of states have defined that offense.[46]

Accordingly, we hold that for purposes of the Sentencing Guidelines, generic federal robbery is defined as it is in the majority of state robbery statutes, without the requirement of more than *de minimis* force. Because both North Carolina common law robbery and generic federal robbery thus contain the same elements, the District Court did

---

[46] *Santiesteban-Hernandez* is, indeed, the only case we have identified in which a court chose to follow the MPC definition of an offense over that employed by the majority of states. Other courts have rejected generic federal definitions insofar as they conflict with the definitions employed by the majority of states. *See, e.g.*, *Duncan*, 833 F.3d at 755-56; *Lockley*, 632 F.3d at 1244; *United States v. De Jesus Ventura*, 565 F.3d 870, 876-78 (D.C. Cir. 2009) (defining kidnapping in accordance with the definition employed by most states, rather than that used in the MPC, and describing state definitions as "[m]ost critical[]" in the process). The Fourth Circuit appears to have recognized this, rejecting elements in an MPC definition of an offense where they conflict with the approach of the majority of states. *See United States v. Flores-Granados*, 783 F.3d 487, 496 (4th Cir. 2015). We do not suggest, however, that the approach of the majority of states will always be dispositive in crafting any federal definition of a crime; rather, it is only the most important of the factors to be considered by the district court in defining a federal offense. In crafting a generic definition, courts should also consider various factors such as the margin of the majority, contrary legislative history, and other evidence of congressional intent.

not err in treating Graves' convictions for North Carolina common law robbery as the enumerated crime of robbery and applying the career offender enhancement to his sentence.

## III.

In light of the foregoing, we will affirm both the conviction and the sentence of the District Court.