PRECEDENTIAL


UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————

No. 17-3103

———————


UNITED STATES OF AMERICA

v.

IBRAHIM McCANTS,
                              Appellant

———————


On Appeal from the United States District Court
for the District of New Jersey
(D.C. No. 2-15-cr-00551-001)
District Judge: Honorable Esther Salas

———————


Argued September 6, 2018
Before: HARDIMAN, KRAUSE, and BIBAS,
*Circuit Judges*.

(Filed:  April 5, 2019)

Leticia Olivera [Argued]
Louise Arkel
Office of Federal Public Defender
1002 Broad Street
Newark, NJ 07102
     *Attorneys for Appellant*

Mark E. Coyne
Richard J. Ramsay [Argued]
Office of United States Attorney
970 Broad Street, Room 700
Newark, NJ 07102
     *Attorneys for Appellee*

Brett G. Sweitzer
Federal Community Defender Office
601 Walnut Street
The Curtis Center, Suite 540 West
Philadelphia, PA  19106
     *Attorney for Amicus Appellant*

———————

OPINION OF THE COURT

———————

HARDIMAN, *Circuit Judge*.

Ibrahim McCants appeals his judgment of conviction and sentence. McCants argues he was wrongly convicted based on evidence that was found during an unconstitutional search. He also claims his sentence cannot stand because he was wrongly designated a career offender under the United States

Sentencing Guidelines. For the reasons that follow, we will affirm.

## I

On the afternoon of June 28, 2015, a New Jersey woman dialed 911 to report an ongoing domestic dispute. Here's how the call went:

CALLER: Can I have the number to East Orange Police Department.

DISPATCHER: You need where?

CALLER: East Orange Police Department. It's [*sic*] emergency.

DISPATCHER: What's the problem?

CALLER: This guy is out here beating up his girlfriend. He's about to kill her.

DISPATCHER: Where's this at?

CALLER: It's on Grove Street in East Orange.

DISPATCHER: Grove and—where on Grove?

CALLER: Grove and, and, and like Williams Street.

DISPATCHER: What is he wearing?

CALLER: He's wearing a red hat, with braids and he's beating her up really bad right now I wanna break—I wanna break it up but, I don't wanna do nothing.

DISPATCHER: No—you don't want to do that. Stay—hold on a second, ma'am.

*United States v. McCants*, No. 15-551, 2016 WL 4705452, at *1 (D.N.J. Sept. 7, 2016). As the operator was preparing to dispatch police to the scene of the altercation, the caller repeated "he is beating her up really badly" and stated, "I think he has a gun." *Id.* The caller then hung up and the operator dispatched the call in this way:

> Grove and William, Grove and William, right now from a caller, it's a male beating a female really badly, male has braids with a red hat . . . . Again, it's going to be Grove and William. Male, female. Male beating a female. Male has braids red hat—at this time, I am advising the caller not to intervene . . . . Now she is saying she believes he has a gun . . . . Red hat and braids. Alright, the caller disconnected.

*Id.*

East Orange police were in the area at the time the call was dispatched and they found a man matching the description near 146 Grove Street within one minute. Officer Moses Sangster was the first to arrive on the scene. He "noticed a male with dreads and a red hat" walking north on Grove Street with a woman. App. 76. The couple was later identified as Appellant Ibrahim McCants and Chelsea Fulton. Two other officers—Stephen Rochester and Cory Patterson—also arrived on the scene within minutes after hearing the call. Before they approached the couple, Officer Rochester confirmed with the dispatcher that "the male actor involved had dreadlocks." App. 78. Officers Rochester and Patterson then "immediately

4

engaged" McCants and frisked him due to the "nature of the call for service." *Id.* During the pat down, Officer Rochester found a loaded handgun inside a fanny pack McCants was wearing. The officers placed McCants under arrest and recovered distributable quantities of heroin.

Several written police reports described the interactions between McCants and Fulton when the officers arrived at the scene. Officer Rochester reported that he observed McCants "speaking with a black female." *Id.*[1] Both McCants and Fulton confirmed in separate interviews they had been arguing, though Fulton said, "at no point did the argument get physical." App. 82. Officer Crystal Singleton and Detective Jaleesa Wreh reported that Fulton showed no signs of injury.

II

A grand jury charged McCants with unlawful possession of a firearm by a convicted felon in violation of 18 U.S.C. § 922(g)(1) and possession with intent to distribute heroin in violation of 21 U.S.C. §§ 841(a) and (b)(1)(C). McCants filed a pretrial motion to suppress the firearm and drugs and requested an evidentiary hearing on the motion, arguing the officers did not have reasonable suspicion that he was engaged in criminal activity before they frisked him. The

---

[1] Although the parties largely agreed on the facts, they disputed whether McCants and Fulton were arguing when the officers arrived. The Government claimed they were "yelling at each other." *McCants*, 2016 WL 4705452, at *2. But McCants argued in his motion to suppress they were not and Fulton corroborated McCants's account in an affidavit. The District Court did not make any factual findings regarding this dispute.

5

Government opposed the motion, and the District Court denied it without oral argument. The Court found that the stop was based on reasonable suspicion because the caller's "anonymous tip bore sufficient indicia of reliability." *McCants*, 2016 WL 4705452, at *7.

The District Court then conducted a stipulated bench trial, and McCants was found guilty as charged on both counts. The United States Probation Office prepared a Presentence Investigation Report (PSR) in which it designated McCants a career offender. McCants objected to the PSR, arguing that his two previous second-degree robbery convictions in New Jersey did not qualify as crimes of violence under § 4B1.2 of the Sentencing Guidelines. Had the convictions not qualified as crimes of violence, his advisory range would have been lowered from 168–210 months to 63–78 months under Guidelines § 2K2.1. The District Court overruled McCants's objection, concluding that his two prior robbery convictions qualified as crimes of violence. At sentencing, the Court varied downward, imposing a sentence of 120 months' imprisonment followed by three years of supervised release. McCants timely appealed.

## III

The District Court had jurisdiction under 18 U.S.C. § 3231 and we have jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a). McCants argues that the District Court erred in denying his motion to suppress and in finding that his prior robbery convictions qualified as crimes of violence under Guidelines § 4B1.2. We review the District Court's factual findings for clear error and its legal conclusions de novo. *United States v. Lowe*, 791 F.3d 424, 427 (3d Cir. 2015). We review de novo the Court's determination that a conviction

constitutes a "crime of violence" under the Guidelines. *United States v. Chapman*, 866 F.3d 129, 131 (3d Cir. 2017).

IV

We begin by addressing McCants's argument that he was wrongly convicted because the District Court admitted into evidence the fruits (drugs and a gun) of an unconstitutional search. The dispositive question underlying this argument is whether the anonymous 911 tip provided sufficient indicia of reliability for reasonable suspicion of ongoing criminal activity.

The Fourth Amendment prohibits "unreasonable searches and seizures." U.S. CONST. amend. IV. Although searches generally require warrants supported by probable cause, officers may conduct brief investigatory stops under *Terry v. Ohio*, 392 U.S. 1 (1968), if they have "reasonable, articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000). Such reasonable suspicion requires "at least a minimal level of objective justification for making the stop" and more than an "inchoate and unparticularized suspicion or 'hunch'" of criminal activity. *Id.* at 123–24 (internal quotation marks omitted) (quoting *Terry*, 392 U.S. at 27). We evaluate the totality of the circumstances in considering "whether a reasonable, trained officer standing in [the officer's] shoes could articulate specific reasons justifying [the] detention." *United States v. Brown*, 448 F.3d 239, 246–47 (3d Cir. 2006) (internal quotation marks omitted) (quoting *Johnson v. Campbell*, 332 F.3d 199, 206 (3d Cir. 2003)).

A body of caselaw has developed over the years involving anonymous reports to police of criminal activity.

7

These tips can provide reliable information helpful to investigations and can create reasonable suspicion of ongoing criminal activity. *Navarette v. California*, 572 U.S. 393, 397 (2014). Whether an anonymous tip provides enough information for reasonable suspicion depends "upon both the content of information possessed by police and its degree of reliability." *Alabama v. White*, 496 U.S. 325, 330 (1990).

Our Court has identified five factors that indicate reliability for anonymous tips:

> (1) The tip information was relayed from the informant to the officer in a face-to-face interaction such that the officer had an opportunity to appraise the witness's credibility through observation.

> (2) The person providing the tip can be held responsible if her allegations turn out to be fabricated.

> (3) The content of the tip is not information that would be available to any observer. . . .

> (4) The person providing the information has recently witnessed the alleged criminal activity.

> (5) The tip predicts what will follow, as this provides police the means to test the informant's knowledge or credibility[.]

*United States v. Torres*, 534 F.3d 207, 211 (3d Cir. 2008) (ellipsis in original). In assessing the reliability of a tip, courts within the Third Circuit must consider these factors with

8

reference to the totality of the circumstances presented in each case. *Id.*

Here, the District Court found that "the [c]aller's anonymous tip bore sufficient indicia of reliability," which provided the officers with reasonable suspicion to stop and frisk McCants consistent with *Terry*. *McCants*, 2016 WL 4705452, at *7. In the District Court's view, the tip sufficed because the caller used the 911 system to report firsthand knowledge of ongoing domestic violence, and she gave an accurate description that was quickly confirmed by the police.

McCants argues that the 911 call could not have provided the officers with reasonable suspicion to justify the stop for two main reasons: (1) the tip was vague and did not demonstrate sufficient indicia of reliability; and (2) the officers did not find corroborating evidence of domestic violence at the scene. These arguments are unpersuasive in light of controlling precedent.

First, McCants contends that the 911 call was unreliable because it was akin to the bare-bones tip deemed inadequate by the Supreme Court in *Florida v. J.L.*, 529 U.S. 266 (2000). In *J.L.*, the police received an anonymous call "that a young black male standing at a particular bus stop and wearing a plaid shirt was carrying a gun." *Id.* at 268. The Supreme Court held that this "bare report of an unknown, unaccountable informant" who did not explain the basis for his tip lacked sufficient indicia of reliability. *Id.* at 271. But the facts of McCants's appeal differ from *J.L.* in important respects. Here, the 911 caller gave a firsthand account of ongoing criminal activity, as well as a highly specific and accurate description of the suspect's location, clothing, and hair. In *J.L.*, the informant reported significantly fewer details and described potentially

9

innocuous behavior without explaining why the informant thought the subject was committing (or was about to commit) a crime. Because of these differences, we disagree with McCants that the 911 call mirrors the limited and vague report in *J.L.*

As the Government argues, the indicia of reliability in McCants's case are like those in *Navarette v. California*. The Supreme Court there concluded that a tip created reasonable suspicion of drunk driving because it was highly specific, based on substantially contemporaneous eyewitness knowledge, and reported over the 911 system. *Navarette*, 572 U.S. at 399–401. The Court explained that the eyewitness's firsthand knowledge of ongoing criminality "lends significant support to the tip's reliability." *Id.* at 399. So too here, where police were able to confirm the detailed description of the suspect within minutes of the call. In fact, McCants was engaged by police much more quickly than was Navarette, who wasn't stopped until eighteen minutes after the dispatcher's call. *Id.* In *Navarette*, the Supreme Court also reasoned that the 911 call bolstered the tip's credibility because the system's ability to identify callers is a safeguard against false reports. *Id.* at 400. Although 911 calls are not per se reliable and the police in this case did not identify the caller, the informant's use of the 911 system here adds to the tip's reliability in the same way it did in *Navarette*.

Relatedly, McCants argues that the District Court did not give adequate consideration to three of the reliability factors we identified in *Torres*: the lack of face-to-face interaction between the informant and police; the absence of predictive information in the call; and the fact that the content of the caller's tip was available to any observer. Although it is true that the 911 call here does not present all of the reliability

factors, this deficiency does not preclude a finding of reasonable suspicion because, as we have explained, "a tip need not bear all of the indicia—or even any particular indicium—to supply reasonable suspicion." *Torres*, 534 F.3d at 213. Accordingly, the District Court did not err when it concluded that the tip was sufficiently reliable because it met two of the factors: the informant "recently witnessed the alleged criminal activity," *McCants*, 2016 WL 4705452, at *5 (quoting *Brown*, 448 F.3d at 249–50), and can be "held responsible if her allegations turn out to be fabricated," *id.* at *6 (quoting *Brown*, 448 F.3d at 249).

McCants next argues that "[n]o reasonable officer would have stopped and frisked" him based on an allegation of ongoing domestic violence when Fulton, the putative victim, showed no signs of injury. McCants Br. 30. This argument too is contrary to the Supreme Court's decision in *Navarette*, where the officers followed Navarette's car for five minutes without noticing any sign of drunk driving. The absence of corroborative evidence, the Court held, did not negate the reasonable suspicion created by the 911 call. *Navarette*, 572 U.S. at 403–04. In the Court's opinion, "[o]nce reasonable suspicion of drunk driving arises, '[t]he reasonableness of the officer's decision to stop a suspect does not turn on the availability of less intrusive investigatory techniques.'" *Id.* at 404 (quoting *United States v. Sokolow*, 490 U.S. 1, 11 (1989)).

In considering the officers' reasonable inferences about Fulton's demeanor, we note that we have given "considerable deference to police officers' determinations of reasonable suspicion given their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." *United States v. Graves*, 877 F.3d 494, 499

11

(3d Cir. 2017) (internal quotation marks omitted) (quoting *United States v. Brown*, 765 F.3d 278, 290 (3d Cir. 2014)), *cert. denied*, 139 S. Ct. 159 (2018). And as the District Court noted, the Seventh Circuit addressed the circumstances common to domestic violence calls while upholding a *Terry* stop under facts similar to those presented in this appeal. *See United States v. Wooden*, 551 F.3d 647 (7th Cir. 2008).

In *Wooden*, the police responded to an anonymous report that a tall, black male wearing a black jacket and blue jeans was arguing with his girlfriend and had drawn a gun at a specific location. *Id.* at 648. The police conducted a pat-down even though the couple was chatting amicably when the officers arrived. *Id.* at 648, 650. In upholding the stop, the Seventh Circuit recognized that the report implied the need for a hasty response. *Id.* at 650. The court observed, along with other factors supporting reasonable suspicion, that "domestic violence comes and goes" and there is a "risk that an armed man may threaten the woman with him" with future violence if she does not remain calm when police arrive. *Id.*

McCants's argument regarding Fulton's demeanor does not give proper weight to law enforcement officers' experiences and training regarding domestic violence. He contends that while it was "plausible that the suspect car in *Navarette* was observed driving normally after running someone off the road," no officer could have reasonable suspicion of ongoing domestic violence after approaching Fulton, who was composed and unscathed. McCants Br. 32. This comparison to *Navarette* is unpersuasive: considering officers' experiences, it might be *less* plausible that a drunk-driving suspect could drive normally for five minutes than that Fulton might appear calm and uninjured during her interaction with the police. *See Wooden*, 551 F.3d at 650. For these

12

reasons, the District Court did not err in deferring to the officers' reasonable inferences regarding Fulton's demeanor in light of the 911 call.

In sum, viewing all the circumstances, the anonymous tip bore sufficient indicia of reliability and provided the officers with reasonable suspicion that justified the *Terry* stop. The caller used the 911 system to report an eyewitness account of domestic violence and provided the officers with a detailed description of the suspect and location, both of which were quickly confirmed by the police. Accordingly, we hold that the District Court did not err in denying McCants's motion to suppress the evidence collected during the *Terry* stop.

V

We turn next to the sentence imposed upon McCants. The District Court agreed with the Probation Office that McCants is a career offender because two of his prior convictions for second-degree robbery in New Jersey qualify as crimes of violence under the Sentencing Guidelines. The Guidelines define a "crime of violence" as any felony offense under state or federal law that:

> (1) has as an element the use, attempted use, or threatened use of physical force against the person of another [the "elements" clause], or

> (2) is murder, voluntary manslaughter, kidnapping, aggravated assault, a forcible sex offense, robbery, arson, extortion, or the use or unlawful possession of a firearm described in 26 U.S.C. § 5845(a) or explosive material as

13

defined in 18 U.S.C. § 841(c) [the "enumerated offense" clause].

Guidelines § 4B1.2(a).

A

We use the categorical approach to determine whether a prior conviction is a predicate offense for a crime-of-violence sentencing enhancement. *United States v. Ramos*, 892 F.3d 599, 606 (3d Cir. 2018). In doing so, we "compare the elements of the statute under which the defendant was convicted to the [G]uidelines' definition of crime of violence." *Id.* (quoting *United States v. Wilson*, 880 F.3d 80, 83 (3d Cir. 2018)).

McCants's designation as a career offender was based on two convictions under N.J. STAT. ANN. § 2C:15-1, which provides:

a. Robbery defined. A person is guilty of robbery if, in the course of committing a theft, he:

(1) Inflicts bodily injury or uses force upon another; or

(2) Threatens another with or purposely puts him in fear of immediate bodily injury; or

(3) Commits or threatens immediately to commit any crime of the first or second degree.

. . . .

b. Grading. Robbery is a crime of the second degree, except that it is a crime of the first degree

if in the course of committing the theft the actor attempts to kill anyone, or purposely inflicts or attempts to inflict serious bodily injury, or is armed with, or uses or threatens the immediate use of a deadly weapon.

N.J. STAT. ANN. § 2C:15-1.

We can look beyond the elements of the statute for this comparison only if it is "divisible" and lists "elements in the alternative, and thereby define[s] multiple crimes." *Mathis v. United States*, 136 S. Ct. 2243, 2249 (2016). The statute is phrased disjunctively, using "or" to offset subsections (a)(1) through (a)(3). Such a statute is divisible if it lists "elements" of the offense and not "means" of committing that offense. *Id.* at 2248. "'Elements' are the 'constituent parts' of a crime's legal definition—the things the 'prosecution must prove to sustain a conviction.'" *Id.* (quoting *Elements of Crime*, BLACK'S LAW DICTIONARY (10th ed. 2014)). "At a trial, they are what the jury must find beyond a reasonable doubt to convict the defendant, and at a plea hearing, they are what the defendant necessarily admits when he pleads guilty." *Id.* (citation omitted). "Means," on the other hand, are "various factual ways of committing" a single element. *Id.* at 2249.

McCants insists the New Jersey robbery statute is indivisible because the alternatives in subsections (a)(1)–(3) are means, rather than elements. He contends that under *Mathis*, alternatively-phrased statutes contain elements only when each subsection carries different punishments, which is not true of the New Jersey robbery statute. We disagree. In *Mathis*, the Supreme Court explained that "the statute on its face may resolve the issue" of characterizing alternatives. *Id.* at 2256. In doing so, the Court used differences in punishment

15

as an example of a clear statutory clue, not as the only permissible textual analysis. *See id.*

We agree with the Government that the New Jersey robbery statute sets out alternative elements for sustaining a conviction rather than the means of committing the offense. Crimes comprise elements; means illustrate ways of satisfying individual elements. If the subsections of § 2C:15-1 were means, they would list "diverse means of satisfying *a single element*" of robbery. *Id.* at 2249 (emphasis added). But the statute does not identify an individual element of which subsections (a)(1)-(3) are mere examples—it states no overarching genus of which they are species. Instead, it lists in the disjunctive three separately enumerated, alternative elements of robbery.

By contrast, in *Mathis*, the burglary statute defined burglary to require "enter[ing] an occupied structure," IOWA CODE § 713.1, and gave as examples of an occupied structure "any building, structure, [or] land, water, or air vehicle," *id.* § 702.12. Thus, the element (the genus) for burglary was an occupied structure and the means (the species) were any building, structure, or land, water, or air vehicle. Here, the alternative elements for robbery are (a)(1)-(3) and the means are the various types of force, threats, and crimes that could satisfy those subsections. Structurally, § 2C:15-1 puts subsections (a)(1)-(3) on the level of elements, not means.

Subsections (a)(1)–(3) are elements because each requires different proof beyond a reasonable doubt to sustain a second-degree robbery conviction. Under (a)(1), the prosecutor must prove that the defendant inflicts injury or uses force upon another person. However, the defendant need only threaten or place another person in fear of immediate bodily

16

injury under (a)(2), or threaten to commit another first- or second-degree crime under (a)(3).

Our conclusion would be different if McCants could show "that a jury" in New Jersey "need not make any specific findings (or a defendant admissions) on" which of these subsections a defendant violated. *Mathis*, 136 S. Ct. at 2249. If "[a] jury could convict even if some jurors conclude[d] that the defendant [violated (a)(1)] while others conclude[d] that he [violated (a)(2)]," then the subsections would be means, not elements. *Id.* (internal quotation marks omitted). Because McCants makes no such showing, we rely on the phrasing and structure of § 2C:15-1 to hold that subsections (a)(1)-(3) list elements, not means.

This analysis parallels our decision in *United States v. Blair*, 734 F.3d 218 (3d Cir. 2013), where we held that Pennsylvania's similar robbery statute was divisible because of its "clearly laid out alternative elements." *Id.* at 225. McCants argues that our reasoning in *Blair* has been abrogated by *Mathis*. But this argument is a nonstarter because earlier this year we reaffirmed that the Pennsylvania robbery statute is divisible. *United States v. Peppers*, 899 F.3d 211, 232 (3d Cir. 2018) (citing *Mathis*, 136 S. Ct. at 2256; *Blair*, 734 F.3d at 225).[2] Because N.J. STAT. ANN. § 2C:15-1 lays out alternative

---

[2] We held that this Pennsylvania robbery statute, which was alternatively-phrased, is divisible:

(1) A person is guilty of robbery if, in the course of committing a theft, he:

(i) inflicts serious bodily injury upon another;

17

(ii) threatens another with or intentionally puts him in fear of immediate serious bodily injury;

(iii) commits or threatens immediately to commit any felony of the first or second degree;

(iv) inflicts bodily injury upon another or threatens another with or intentionally puts him in fear of immediate bodily injury; or

(v) physically takes or removes property from the person of another by force however slight.

*Peppers*, 899 F.3d at 231 (quoting 18 PA. CONS. STAT. § 3701(a) (June 24, 1976 to May 16, 2010)). Unlike the New Jersey statute, a few subsections of the Pennsylvania statute carried different penalties. Robbery under subsection (a)(1)(iv) was a second-degree felony, while subsection (a)(1)(v) was a third-degree felony. Otherwise, robberies under the other subsections were first-degree felonies. *Id.*

In *Ramos*, we explained that a similarly-structured Pennsylvania assault statute is divisible two ways. 892 F.3d at 606. First, the statute "proscribes two alternative degrees of aggravated assault, which are subject to different maximum sentences." *Id.* at 609. Second, we found "the statute is further divisible into four, alternative second-degree aggravated assault offenses" because the statute uses disjunctive language to list alternative elements—rather than alternative factual means for committing the offense—in each subsection. *Id.* Accordingly, disjunctive language setting out elements that must be proved beyond a reasonable doubt can independently show the statute is divisible on its face.

18

elements upon which prosecutors can sustain a second-degree robbery conviction, we hold that the statute is divisible.

B

Having determined that the relevant statute is divisible, we must ascertain whether McCants's New Jersey robbery convictions were predicate offenses that render him a career offender. For divisible statutes, we use the modified categorical approach to decide whether the defendant was convicted of a qualifying offense under the Guidelines. *Shepard v. United States*, 544 U.S. 13, 19–20, 26 (2005). This gives us recourse to the "*Shepard* documents"—which include the charging document, guilty plea allocution, jury instructions, and judgment of conviction—to determine the subsection upon which the conviction was based. *United States v. Brown*, 765 F.3d 185, 189–90 (3d Cir. 2014).

Although the charging documents do not state explicitly which subsection of the statute McCants was convicted under, they do indicate that McCants was charged with violent crimes.[3] And a review of McCants's plea colloquy leads necessarily to the conclusion that he pleaded guilty to violating subsection (a)(2) of the New Jersey robbery statute. Therein, McCants acknowledged using force in committing both robberies. Regarding the first robbery offense on December 13, 2003, the court asked McCants: "On that day did you attempt or succeed by the use of threat of force, in taking some items from an individual in the City of Newark?" App. 266. He

---

[3] The first robbery indictment charges that McCants used or threatened the use of what the victim perceived as a deadly weapon. The second indictment charges that he threatened the use of a deadly weapon.

responded, "Yeah." App. 267. Regarding the second robbery offense on April 28, 2004, the court asked McCants: "And on that occasion did you take or attempt to take from an individual by the threat of force some items?" *Id.* He again responded, "Yes." *Id.* We agree with the Government that McCants's admissions that he threatened or attempted to threaten another with force is evidence of guilt under subsection (a)(2), which requires that a defendant "[t]hreaten[] another with or purposely put[] him in fear of immediate bodily injury."

Although McCants concedes that the colloquy shows he did not plead guilty under subsection (a)(1), which requires the use of force, he makes two semantic arguments that his admissions do not fall under subsection (a)(2). First, he contends the colloquy does not address injury or fear, which he believes are required by the statute. Second, he argues his admissions regarding force do not equate to threats of immediate bodily injury. Taken together, he claims the colloquy allows for the possibility that he was convicted under subsection (a)(3), which does not require violent force.

We disagree that McCants's colloquy shows he could have been convicted under subsection (a)(3). First, his semantic arguments are inconsistent with the plea colloquy. His admissions of attempting or successfully using threat of force to take items from individuals most closely match subsection (a)(2). Second, McCants points to nothing in the colloquy permitting even the inference that he pleaded guilty under subsection (a)(3). Had McCants pleaded guilty to subsection (a)(3), he would have needed to admit that he committed or threatened to commit another crime. Yet his plea colloquy makes reference to neither. Because he could not have pleaded guilty to subsection (a)(3) and McCants concedes he was not convicted under subsection (a)(1), the only logical

20

choice is subsection (a)(2). Thus, we have no reason to overturn the District Court's finding that the natural reading of the plea colloquy is that McCants's two prior robbery convictions fall under N.J. STAT. ANN. § 2C:15-1(a)(2).

C

Finally, we must decide whether McCants's convictions under subsection (a)(2) are predicate offenses under either the "elements" clause or the "enumerated offense" clause of § 4B1.2(a) of the Guidelines. In our view, they satisfy both.

Under the elements clause (§ 4B1.2(a)(1)), a conviction qualifies if it "has as an element the use, attempted use, or threatened use of physical force against the person of another." We have explained that the "use of physical force . . . involves the intentional employment of something capable of causing physical pain or injury to another person, regardless of whether the perpetrator struck the victim's body." *Chapman*, 866 F.3d at 133 (internal quotation marks omitted). Subsection (a)(2) of the robbery statute requires that the defendant "[t]hreaten[] another with or purposely put[] him in fear of immediate bodily injury." N.J. STAT. ANN. § 2C:15-1(a)(2). In New Jersey, "bodily injury" is defined as "physical pain, illness or any impairment of physical condition." *Id.* § 2C:11-1(a). Under both the Guidelines and New Jersey definitions, the defendant must place another in fear of physical pain or injury. Because § 4B1.2(a)(1) does not mandate physical contact, New Jersey's definition of "bodily injury" falls within the Guidelines' definition of "crime of violence." Accordingly, we hold that McCants's conviction under subsection (a)(2) qualifies as a crime of violence under the elements clause of § 4B1.2(a)(1) of the Guidelines.

21

We reach the same result with regard to the enumerated offense clause (§ 4B1.2(a)(2)), which lists "robbery" as a crime of violence. When the Guidelines specifically list an offense, we "compare the elements of the crime of conviction to the generic form of the offense as defined by the States, learned treatises, and the Model Penal Code." *United States v. Marrero*, 677 F.3d 155, 165 (3d Cir. 2012) (quoting *United States v. Lockley*, 632 F.3d 1238, 1242 (11th Cir. 2011)), *vacated on other grounds*, 570 U.S. 929 (2013). The defendant's prior conviction qualifies as a crime of violence if "the statutory definition of the prior conviction 'substantially corresponds' to the generic definition of the offense." *Id.* (quoting *Taylor v. United States*, 495 U.S. 575, 602 (1990)).

McCants and the Government agree that "the generic definition of robbery is . . . the taking of property from another person or from the immediate presence of another person by force or by intimidation." App. 199. We held in *Graves* that "generic robbery requires no more than *de minimis* force" to meet this definition. 877 F.3d at 503. In evaluating whether McCants's robbery convictions qualify as crimes of violence under the enumerated offense clause, we must determine whether the New Jersey statute is broader than the generic offense.

Subsection (a)(2) requires that the defendant "[t]hreaten[] another with or purposely put[] him in fear of immediate bodily injury." N.J. STAT. ANN. § 2C:15-1(a)(2). We agree with the Government that subsection (a)(2) falls within the definition of generic robbery because the statute requires the threat of bodily injury, which involves more force—and is therefore categorically narrower—than *de minimis* force, *Graves*, 877 F.3d at 504. Accordingly, we hold that McCants's convictions under subsection (a)(2) qualify as

22

crimes of violence under the enumerated offense clause of § 4B1.2(a)(2). Therefore, the District Court rightly designated McCants a career offender because his two prior convictions for second-degree robbery in New Jersey qualified as crimes of violence under the Guidelines.

\*       \*       \*

The District Court did not err in denying McCants's motion to suppress or in imposing his sentence. We will affirm the judgment of conviction and sentence.